Jane P. Davenport (*pro hac vice pending\**)
Daniel Franz (*pro hac vice pending\**)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
Phone: (202) 772-3274
jdavenport@defenders.org
dfranz@defenders.org

*Attorneys for Plaintiff*

\* Attorneys will submit their *pro hac vice*
materials immediately upon the case being
assigned a number and the docket
becoming available in PACER.

## UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| DEFENDERS OF WILDLIFE,<br><br>    Plaintiff,<br><br>         vs.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; BRIAN NESVIK, in his official capacity as the Director of the U.S. Fish and Wildlife Service; and KING COVE CORPORATION, an Alaska Native Village Corporation,<br><br>    Defendants. | Case No. 3:25-cv-00319<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    Defenders of Wildlife hereby challenges the unlawful final agency

actions of Doug Burgum, Secretary of the Interior, and Brian Nesvik, Director of the U.S. Fish and Wildlife Service (collectively, Federal Defendants), in determining to enter into an unlawful land exchange agreement with King Cove Corporation to exchange away roughly 484 acres in the heart of the Izembek National Wildlife Refuge and Wilderness out of federal possession and protection to enable King Cove Corporation to build a road connecting King Cove and Cold Bay, Alaska. These unlawful final agency actions, as well as the exchange of patent and warranty deed effectuating the 2025 Agreement, violate the Wilderness Act, the National Wildlife Refuge System Administration Act as amended by the National Wildlife Refuge System Improvement Act, and the Administrative Procedure Act.

2.      The planned road will result in incalculable and irreversible damage to the myriad wildlife species, the world-class wetlands and lagoon complex on the Izembek isthmus, and the pristine wilderness values for which Izembek is known nation- and worldwide. Defenders of Wildlife's (Defenders) members have protected aesthetic, professional, recreational, scientific, economic, and other interests in Izembek's species, habitats, and wilderness values that have been and will be irreparably harmed by Federal Defendants' unlawful actions. By filing suit to ensure Federal Defendants fully comply with the Refuge and Wilderness Acts that protect its members'

interests, Defenders seeks this Court's intervention in vacating Federal Defendants' unlawful actions, ordering the land exchange undone, and restoring the integrity of Izembek National Wildlife Refuge and Wilderness.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the Wilderness Act, the National Wildlife Refuge System Administration Act as amended by the National Wildlife Refuge System Improvement Act (Refuge Act), and the Administrative Procedure Act (APA). An actual, justiciable controversy exists between the parties. U.S. Const., art. III, § 2, cl. 1. The requested declaratory and injunctive relief is proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706. The APA waives Federal Defendants' sovereign immunity because Plaintiff challenges final agency actions. *Id*. § 702.

4.      This Court has personal jurisdiction over King Cove Corporation (KCC), a 100% Alaska Native Village Corporation based in King Cove, Alaska.

5.      Venue in this Court is proper under 28 U.S.C. § 1391(e)(1). This action is brought against Doug Burgum, duly appointed Secretary of the Interior (Department or Interior), in his official capacity, and Brian Nesvik, duly appointed Director of the U.S. Fish and Wildlife Service (Service), in his

official capacity, and KCC, an Alaska Native Village Corporation based in King Cove, Alaska. A substantial part of the events or omissions giving rise to the claim occurred in this district, and/or a substantial part of property that is the subject of the action is situated in this district, because Izembek National Wildlife Refuge and Wilderness (Izembek), the subject of the land exchange at issue, is in the district.

## PARTIES

### Plaintiff

6.     Plaintiff Defenders of Wildlife is a nonprofit 501(c)(3) membership organization dedicated to the protection and restoration of all native U.S. species in their natural communities and the preservation of the habitats on which these species depend. Defenders is headquartered in Washington, DC, and has over 251,000 members across the United States, of whom more than 500 reside in Alaska. Defenders' Alaska program within Defenders' Field Conservation program works on issues unique to the state. Defenders' National Wildlife Refuges and Parks program within Defenders' Conservation Policy program works on issues unique to managing federal conservation lands across the nation, including national wildlife refuges, national parks, and national wilderness areas within refuges and parks.

7.     Defenders brings this action on behalf of itself and its members. Defenders' members appreciate the wide diversity of species that rely on the

Izembek Refuge ecosystem as year-round and migratory habitats, both terrestrial and aquatic. These members also value Izembek Wilderness for its unique wilderness character and the opportunity it provides to be away from the sights and sounds of a motorized, industrialized world. Defenders' members have aesthetic, recreational, conservation, economic, scientific, spiritual, and environmental interests in Izembek's ecosystem, species, and the integrity of national wildlife refuge and wilderness statutory protections. Defenders' members' recreational interests in Izembek include hiking, backpacking, boating, wildlife viewing, photography and videography, fishing, and hunting. Defenders' members have concrete plans to continue pursuing those activities in Izembek, activities that are dependent on the continued existence of a healthy ecosystem supporting diverse wildlife populations as well as the continued existence of intact wilderness. Defenders' members' interests and their enjoyment of these activities have been and will be diminished because of the removal of federal protections for and transfer to private ownership of a 19-mile corridor (encompassing approximately 484 acres) through the heart of Izembek Refuge and Wilderness for the purpose of constructing a road that will be used in perpetuity for motorized traffic and commercial enterprise.

8. Nicole Whittington-Evans is a Defenders member and employee who lives in Palmer, Alaska, and works as the Senior Director of Defenders

Alaska & Northwest programs. Ms. Whittington-Evans is familiar with Defenders' decades-long history advocating to protect Izembek from being bisected by a road. During her tenure at Defenders, she has spearheaded the organization's advocacy efforts on Izembek. Ms. Whittington-Evans has visited Izembek on four occasions over the past two decades, including most recently in October 2025. While in Izembek, she has enjoyed walking in Izembek Wilderness within the area of the road corridor and viewing wildlife, including walrus, northern sea otters, emperor geese, Pacific black brant, Steller's eiders, and other bird species. She particularly appreciates the unique opportunity to see tens of thousands of birds congregated for migration and is inspired by the Joshua Green River watershed within Izembek, which serves as prime habitat for bears. She plans to return to Izembek in September or October 2026, and is excited to view the diversity of waterfowl that congregate in the Izembek and Kinzarof Lagoons during the fall migration. Her protected aesthetic, recreational, and professional interests in and enjoyment of future visits to Izembek have been and will continue to be harmed by Federal Defendants' unlawful final agency actions taken to facilitate the construction of the planned King Cove road.

9.     Brianne Rogers is another Defenders member with a strong interest in maintaining the integrity of the Izembek Refuge and Wilderness under federal statutory protections and in preventing the construction of the

planned road through the heart of Izembek. Ms. Rogers splits her time between Cold Bay, Alaska, and Bozeman, Montana, typically spending four months in Alaska each year. She regularly spends time in Izembek Refuge and Wilderness, both for personal recreation and as a professional guide working out of Cold Bay during the fall. She has guided recreationists in Izembek since 2019 and is currently in Cold Bay through mid-December 2025 for additional guiding this year. Ms. Rogers plans to continue visiting Izembek far into the future with concrete plans to begin commercial guiding again in August 2026. She also has plans to return in the spring of 2026 for her personal enjoyment. Ms. Rogers is an avid bird and waterfowl hunter and enjoys the unique opportunities for these activities in Izembek, having hunted Pacific black brant, Taverner's cackling geese, and over a dozen species of duck. She also enjoys viewing other wildlife in Izembek, including northern sea otters, Pacific walruses, and Steller's eider. In addition to her personal enjoyment of Izembek, she also has professional interests in the isthmus ecosystem's integrity. Izembek's unique hunting and wildlife viewing opportunities are a draw for recreationists from across the country, and guiding those recreationists is a part of earning her living. Ms. Rogers' aesthetic, recreational, and professional interests in and enjoyment of future visits to Izembek have been and will continue to be harmed by Federal Defendants' unlawful final agency actions taken to facilitate the construction

of the planned King Cove road

10.     Defenders' and its members' interests have been, are, and will be directly, adversely, and irreparably affected by Federal Defendants' violations of law as alleged herein. Defenders' members will continue to be harmed by Federal Defendants' unlawful final agency actions unless this Court provides the relief prayed for in this Complaint.

**Defendants**

11.     Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity. As Secretary, he is charged with the supervision and management of all decisions, operations, and activities of the Department and its divisions, including the Service.

12.     Defendant Brian Nesvik is the Director of the Service and is sued in his official capacity. As Director, he is charged with the supervision and management of all decisions, operations, and activities of the agency. The Service is an agency within Interior. The Service is the agency to which the Secretary of the Interior has delegated the authority to manage Izembek National Wildlife Refuge under the Refuge Act. The Service is also the agency to which the Secretary of the Interior has delegated authority to manage Izembek Wilderness under the Wilderness Act. The Service is subject to the additional requirements of the Alaska National Interest Lands Conservation Act (ANILCA) for refuge and wilderness lands under its jurisdiction in the

State of Alaska.

13.     Defendant KCC is a 100% Alaska Native Village corporation organized under the laws of the State of Alaska, pursuant to the authority of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601–1629h. KCC is a party to the "Agreement for the Exchange of Lands" executed on October 21, 2025, by Secretary Burgum and by Ms. Chantae Kochuten, Chief Executive Officer of KCC (2025 Agreement). KCC is the grantee of Patent No. 50-2026-0001 that conveyed the surface and subsurface estates in 484.22 acres in Izembek out of federal ownership. Defenders does not assert any claims against KCC. However, as a party to the 2025 Agreement and the grantee of Patent No. 50-2026-0001, KCC's joinder is required pursuant to Federal Rule of Civil Procedure 19(a).

## STATUTORY FRAMEWORK

### Wilderness Act

14.     The Wilderness Act of 1964, 16 U.S.C. §§ 1131–1136, established the National Wilderness Preservation System to be composed of federally reserved and withdrawn wilderness areas that "shall be administered for the use and enjoyment of the American people in such a manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas [and] the preservation of the wilderness character." *Id.* § 1131(a).

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319

15.     Congress defined "wilderness" to mean in part:

A wilderness, in contrast to those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions[.]"

*Id.* § 1131(c).

16.     Congress explicitly directed federal agencies administering wilderness areas to "preserv[e] the wilderness character of the area" and to "administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." *Id.* § 1133(b). "Except as otherwise provided in this chapter, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation and historical use." *Id.*

17.     Congress expressly declared that, with special provisions not applicable here, *see* 16 U.S.C. § 1133(d), there "shall be no commercial enterprise and no permanent road within any wilderness area." *Id.* § 1133(c).

18.     One of Congress's central purposes in enacting the Wilderness Act was to "assure the permanent reservation" of wilderness areas. S. Rep. No. 88-109, at 3 (1963); *see also* H.R. Rep. No. 88-1538, 1964 U.S.C.C.A.N. 3615, at 3615–16 (1964).

19.     Four federal agencies manage wilderness in the National Wildlife Preservation System: the Service manages wilderness in the National Wildlife Refuge System; the U.S. Forest Service manages wilderness within the National Forest System; the National Park Service manages wilderness in the National Park System; and the Bureau of Land Management manages wilderness on federal lands placed under its jurisdiction by the Federal Land Policy and Management Act of 1976. *See also* 16 U.S.C. § 1133(a) ("The purposes of this chapter are hereby declared to be within and supplemental to the purposes for which national forests and units of the national park and national wildlife refuge systems are established and administered[.]"); 50 C.F.R. § 25.12(a) ("For refuges that encompass Congressionally designated wilderness, the purposes of the Wilderness Act are additional purposes of the wilderness portion of the refuge."); 50 C.F.R. § 35.2(a) ("Each wilderness shall be administered for such other purposes for which the national wildlife refuge was established and shall also be administered to preserve its wilderness character.").

20.     Regulations implementing the Wilderness Act for wilderness areas within the National Wildlife Refuge System are found at 50 C.F.R. Part 35. These regulations repeat the statutory prohibition on commercial enterprises and permanent roads within wilderness units. 50 C.F.R. § 35.5.

21.     The Service's implementing policies for its Wilderness Act

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319

obligations within the National Wildlife Refuge System are contained in its Manual at 610 FW. The Service "administer[s] wilderness areas in Alaska following the guidance in this chapter." 610 FW 1.2(C). 610 FW 5 contains special provisions for wilderness in Alaska.

22. The Manual reaffirms the statutory prohibition on permanent roads in wilderness, 610 FW 2.6, as well as commercial enterprises, 610 FW 2.9. The provision clarifies that the exception for "existing private rights" in permanent roads and commercial enterprises applies only to "private rights existing as of the date an area was designated as wilderness." *Id.*

23. The Manual also establishes the "nondegradation principle," which establishes that, "at the time of wilderness designation, the conditions prevailing in an area establish a benchmark of that area's wilderness character and values." 610 FW 1.5(Q). It further establishes that the Service "will not allow the wilderness character and values of the wilderness to be degraded below that benchmark." *Id.*

**Refuge Act**

24. The National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd–668ee, established the National Wildlife Refuge System composed of federal lands "administer[ed] by the Secretary of the Interior for the conservation of fish and wildlife," including "areas for the

protection and conservation of fish and wildlife that are threatened with extinction," *id.* § 668dd(a)(1).

25.     The mission of the Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(2).

26.     Congress declared that it is the policy of the United States that each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." *Id.* § 668dd(a)(3)(A); *see also id.* § 668dd(a)(4)(D) (Federal Defendants must "ensure that the mission of the System . . . and the purposes of each refuge are carried out." Should a conflict arise between a refuge's purposes and the System's mission, Federal Defendants must resolve that conflict "in a manner that first protects the purposes of the refuge, and, to the extent practicable, that also achieves the mission of the System[.]").

27.     Legislative history states that "[t]his policy serves to underscore that the fundamental mission of our Refuge System is wildlife conservation: wildlife and wildlife conservation must come first." H.R. Rep. No. 105-106, 1997 U.S.C.C.A.N. 1798-5, 1798-13 (1997).

28.     "Purpose(s) of the refuge" means "the purposes specified in or

derived from the law, proclamation, executive order, agreement, public land order, donation document, or administrative memorandum establishing, authorizing, or expanding" a national wildlife refuge. 50 C.F.R. § 25.12(a). As noted above, consistent with the Wilderness Act, for refuges that encompass congressionally designated wilderness, "the purposes of the Wilderness Act are additional purposes of the wilderness portion of the refuge." *Id.*; *see also id.* § 35.2 (refuge wilderness areas shall be administered for the refuge's purposes and shall be administered to preserve wilderness character).

29.     Among other requirements, Congress specifically directed Federal Defendants to manage the Refuge System to:

> (A) provide for the conservation of fish, wildlife, and plants, and their habitats within the System;
>
> (B) ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans;
>
> (C) plan and direct the continued growth to the System in a manner that is best designed to accomplish the mission of the System [and] to contribute to the conservation of the ecosystems of the United States . . . ; [and]
>
> (F) assist in the maintenance of adequate water quantity and water quality to fulfill the mission of the System and the purposes of each refuge[.]

16 U.S.C. § 668dd(a)(4). Congress intended these management directives as "affirmative stewardship responsibilities." H.R. Rep. No. 105-106, 1997 U.S.C.C.A.N. at 1798-14.

30.     Congress granted Federal Defendants the authority to "[a]cquire lands or interests therein by exchange . . . for acquired lands on public lands, or for interests in acquired or public lands, under [the Secretary's] jurisdiction which he finds to be suitable for disposition." 16 U.S.C. § 668dd(b)(3)(A).

31.     Additionally, "[t]he values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash." *Id*. § 668dd(b)(3).

32.     The Service's regulations implementing the Refuge Act are found at 50 C.F.R. Parts 25 through 38.

33.     The Service's implementing policies for the Refuge Act land exchange requirements are in the Manual at 342 FW 5.7(B). That policy reaffirms that "[a]ll land exchanges must . . . be suitable for disposition . . . [and] be of benefit to the United States." *Id*.

**ANILCA**

34.     Enacted in 1980, ANILCA, 16 U.S.C. §§ 3101–3233, provided for the designation of new and modified "conservation system units" of public lands in Alaska. *See id*. § 3101(a). ANILCA defines "conservation system units" to mean "any unit in Alaska of the National Park System, National Wildlife Refuge System, National Wild and Scenic Rivers System, National Trails System, National Wilderness Preservation System, or a National

Forest Monument[.]" *Id.* § 3102(4).

35.     ANILCA reflects twin congressional purposes of ensuring conservation and providing for subsistence use. *Id.* § 3101(b)–(c).

36.     The conservation purpose states:

It is the intent of Congress in this Act to preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve wilderness resources values and related recreational opportunities . . . within large arctic and subarctic wildlands and on freeflowing rivers; and to maintain opportunities for scientific research and undisturbed ecosystems.

*Id.* § 3101(b).

37.     The subsistence purpose states:

It is further the intent and purpose of this Act consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded by or pursuant to this Act, to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so.

*Id.* § 3101(c).

38.     Title III designated new national wildlife refuges and established

or redesignated existing refuges with additions. ANILCA §§ 302, 303.[1] ANILCA mandates that "[e]ach refuge shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act." ANILCA § 304(a).

39.    In specific circumstances, ANILCA contains alternative management directives for Alaskan refuge lands that differ from those applicable to refuges elsewhere in the country. *See, e.g.*, ANILCA § 304(g) (unique comprehensive conservation plan requirements); *id.* § 304(c) (withdrawing Refuge lands from future selections by State of Alaska and Native rights); *id.* § 304(d) (requiring permitting existing valid commercial fishing rights); *id.* § 304(e) (granting authority to allow uses to maintain, enhance, and rehabilitate fish stock).

40.    Title VII established various wilderness areas in Alaska in accordance with subsection 3(c) of the Wilderness Act, 16 U.S.C. § 1132(c). *See* ANILCA § 702. ANILCA establishes that "[e]xcept as otherwise expressly provided for in this Act wilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act governing areas designated by that Act as wilderness[.]" *Id.* § 707. ANILCA enumerates alternative management directives for wilderness lands in

_____

[1] Plaintiff cites "ANILCA" for provisions contained in Pub. L. No. 96-487 not codified in the U.S. Code.

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319

Alaska in specific, narrow circumstances. *See, e.g., id.* § 704 (special provision on designating wilderness within Alaskan National Forests); *id.* § 705 (special provision for timber harvest in the Tongass National Forest); *id.* § 706 (requiring timber monitoring reports).

41.    In ANILCA, Congress found that "the existing authorities to approve or disapprove applications for transportation and utility systems through public lands in Alaska are diverse, dissimilar, and, in some cases, absent[.]" 16 U.S.C. § 3161(b). Thus, it dedicated an entire title to providing "a single comprehensive statutory authority for the approval or disapproval" of transportation and utility systems through public lands in Alaska. *Id.* § 3161(c).

42.    Title XI sets out the exclusive procedure for approving transportation and utility systems such as roads across conservation system units in Alaska. Congress enacted Title XI not only to ensure effective decisionmaking but "to minimize the adverse impacts of siting transportation and utility systems within [conservation system] units established or expanded by this Act[.]" *Id.*

43.    Title XI was premised on Congress's understanding that "existing law makes siting of roads and airports, particularly, but other modes as well, very difficult if not impossible in Wilderness, Parks, Wild and Scenic Rivers, and Wildlife Refuges (in descending order of difficulty)." S. Rep. No. 96-413,

1980 U.S.C.C.A.N. 5070, 5189 (1979). Therefore, Congress created the procedures in Title XI to "supersede[] rather than supplement[] existing law" for siting transportation on conservation system units. *Id.* at 5190.

44.     Section 1106 sets out special procedures for approvals for transportation systems that propose to "occupy, use, or traverse any area within the National Wilderness Preservation System." 16 U.S.C. § 3166(b)–(c). Congress expressly retained exclusive authority over approving roads through wilderness in Alaska. *Id.* § 3166(c)(1).

45.     Title XIII sets out administrative provisions that apply broadly to conservation system units. Section 1302 , titled "Land acquisition authority," provides agencies with authority to acquire inholdings within conservation system units such as refuges and wilderness:

> Except as provided in subsections (b) and (c) of this section, the Secretary is authorized, *consistent with other applicable law in order to carry out the purposes of this Act*, to acquire by purchase, donation, exchange, or otherwise any lands within the boundaries of any conservation system unit other than National Forest Wilderness.

16 U.S.C. § 3192(a) (emphasis added).

46.     ANILCA further defines land exchange authority in subsection 1302(h):

> Notwithstanding any other provision of law, in acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands (including lands within conservation system units . . .) or interests therein (including Native selection rights) with the

corporations organized by the Native Groups, Village Corporations, Regional Corporations, and the Urban Corporations, and other municipalities and corporations or individuals, the State . . . or any Federal agency. Exchanges shall be on the basis of equal value, and either party to the exchange may pay or accept cash in order to equalize the value of the property exchanged, except that if the parties agree to an exchange and the Secretary determines it is in the public interest, such exchanges may be made for other than equal value.

*Id.* § 3192(h)(1).

47.    The legislative history reflects congressional intent that this land exchange authority should not be used "to undermine the integrity of any conservation system unit or to frustrate the purposes of any such unit." H.R. Rep. No. 95-1045, pt. I, 211–12 (1978) (Section 1201(f) at that point in the statute's development). Rather, Congress intended the land exchange authority to provide a preferred alternative of acquiring private inholdings from willing sellers rather than through condemnation. *See* S. Rep. 95-1300, 257 (1978) ("The Committee expects the Secretary to utilize his exchange authority and his authority to acquire easements where possible rather than resort to fee condemnation."); H.R. Rep. No. 96-97, pt. I, 245 (1979) ("The Committee recognizes that many of the units will contain State and Native inholdings; however the Committee anticipates that the Secretary will use his authority . . . under section 1101(f) [later renumbered to section 1302(h)] to make exchanges of lands."); H.R. Rep. No. 96-97, pt. II, 304 (1979) ("The Committee has adopted a unique approach to land acquisition because of the

special nature of the Alaskan situation. The intent of this approach is to maximize the use of exchange authority and minimize the use of condemnation authority wherever possible.").

48.     Subsequent to ANILCA, when Congress enacted the National Wildlife Refuge System Improvement Act in 1997, it specified those instances where the management directives contained in ANILCA overwrite those in the Refuge Act. *See* Pub. L. 105-57, § 9, 111 Stat. 1252, 1260 (1997); *see also, e.g.*, 16 U.S.C. § 688dd(e)(1)(A) (stating comprehensive conservation planning requirements for refuges in Alaska are found in ANILCA).

49.     However, Congress did not amend the land exchange provision of the Refuge Act to distinguish between refuges inside and outside of Alaska. *See* 16 U.S.C. § 688dd(b)(3).

**Administrative Procedure Act**

50.     The APA establishes a right to judicial review of agency action. 5 U.S.C. §§ 702–704. Agency action is defined to include "the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). Courts may review final agency actions for which there is no other adequate remedy. *Id.* § 704.

51.     In reviewing an agency action, the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

(D) without observance of procedure required by law[.]"

*Id.* § 706(2). The reviewing court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706.

## FACTUAL BACKGROUND

### Izembek National Wildlife Refuge and Wilderness

52.     Izembek National Wildlife Refuge consists of 315,000 acres of land and water on the Alaska Peninsula and sits between the Bering Sea and the Gulf of Alaska. Although it is the smallest national wildlife refuge in Alaska, it is larger than all except six national wildlife refuges in the lower 48 states.

53.     The Izembek isthmus lies between the Izembek and Kinzarof Lagoons, which together contain one of the largest eelgrass beds in the world.

54.     The lagoons and hydrologically connected wetlands have unique ecological significance both locally and globally and are considered the heart of the refuge.

55.     The lagoons and associated isthmus wetlands host hundreds of

thousands of waterfowl annually, including Pacific black brant, Taverner's Canada goose, emperor goose, tundra swan, and Steller's eider.

56.     The lagoons and isthmus wetlands are critical to fueling the long-distance migration of significant portions of those species, including nearly the entire global population of black brant, a majority of the global population of cackling geese, and a significant number of emperor geese.

57.     Izembek hosts more than 200 species of wildlife, including not only the waterfowl species listed above as well as other waterfowl species that rely on the lagoons, but also Pacific walruses, brown bears, grizzly bears, caribou, moose, wolves, and Pacific salmon.

58.     Some species that use Izembek's terrestrial and aquatic habitats are listed as endangered or threatened under the Endangered Species Act (ESA), including the Southwest Alaska distinct population segment of northern sea otter, Steller sea lion, and Steller's eider. The Izembek lagoon complex is designated critical habitat under the ESA for both Steller's eider and northern sea otters in recognition of the importance of that habitat to those species' survival and recovery.

59.     For terrestrial wildlife, Izembek's isthmus provides a corridor that connects the eastern part of the Refuge with the western part. The isthmus is vital to the Southern Alaska Peninsula caribou herd and other species.

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319

60. The Joshua Green River watershed area within Izembek is prime habitat that hosts one of the highest density populations of brown bears in Alaska.

61. Four species of salmon spawn in Izembek. The Izembek watershed supports all five species of Pacific salmon found in Alaska.

62. Recognizing Izembek's wildlife habitat values, particularly for waterfowl, brown bear, and caribou, in 1960, in the Eisenhower administration, the Secretary of Interior administratively protected this area as a "refuge, breeding ground, and management area for all forms of wildlife" named the Izembek National Wildlife Range. In announcing the Range, Interior stated that Izembek "contain[s] the most important concentration point for waterfowl in Alaska."

63. In 1980, Congress redesignated Izembek National Wildlife Range as Izembek National Wildlife Refuge. ANILCA § 303(3)(A). It also designated 307,982 of the 315,000 refuge acres as wilderness. ANILCA § 702(6).

64. In establishing Izembek as a Refuge, Congress set forth the following purposes:

(i) [T]o conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonids;

(ii) [T]o fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii) [T]o provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and

(iv) [T]o ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

*Id.* § 303(3)(B).

65. Consistent with the Wilderness Act, 16 U.S.C. § 1133(a), and pursuant to Federal Defendants' regulations, the purposes of the Wilderness Act are additional purposes of Izembek's wilderness area. 50 C.F.R. § 25.12(a).

66. Congress based its decision to designate nearly all Izembek lands as wilderness on its finding that:

The Izembek Wilderness possesses outstanding scenery, key populations of brown bear, caribou and other wilderness-related wildlife, and critical watersheds to Izembek Lagoon. About 68 percent of the total lands in Izembek Lagoon are covered with the largest eelgrass beds in the world. These beds are utilized by millions of waterfowl for migration and wintering purposes. A wilderness designation will protect this critically important habitat by restricting access to the lagoon.

H.R. Rep. No. 96-97, pt. 2, at 136 (1979).

67. 60. In designating a majority of Izembek as wilderness, Congress explicitly sought to "protect this critically important habitat by restricting access to the Lagoon."

68. In 1985, Federal Defendants prepared a Comprehensive Conservation Plan (CCP) for Izembek under the Refuge Act that remains in

effect today.

69.    In 1986, the United States designated Izembek's lagoon complex as a Wetland of International Importance under the Ramsar Convention out of recognition of its value as wilderness and wildlife habitat. Federal Defendants viewed that listing as a "national commitment to maintain the ecological characteristics of the area."

70.    The Izembek Wilderness has been managed as wilderness since its designation in 1980. The status of Izembek at the time of designation set the benchmark for future evaluation of Izembek's wilderness character and values based on the Service's nondegradation policy. *See* 610 FWS 1.5.Q.

**History of Attempted Roads Through Izembek**

71.    Izembek lies between the small Alaskan villages of Cold Bay (population 50 in 2020 census) and King Cove (population 757 in 2020 census). The community of King Cove was established in 1911 to support a salmon cannery that closed in 2024.

72.    In 1985, Federal Defendants prepared a Final Environmental Impact Statement (Final EIS) and Record of Decision to accompany Izembek Refuge's Comprehensive Conservation Plan prepared pursuant to the Refuge Act. In the Final EIS, Federal Defendants expressed the view that a road through Izembek's Wilderness could only be accomplished using the procedures of ANILCA Title XI. Federal Defendants concluded that a road

would cause unacceptable environmental impacts, disruption to wilderness, and degradation of the wilderness characteristics of Izembek.

73.    Federal Defendants evaluated a potential road connecting the two villages again in 1996 and 1997, which culminated in decisions in the form of 1996 report and a 1997 decision rejecting a requested land exchange, respectively. Each document reached a similar conclusion as the 1985 Final EIS.

74.    In the King Cove Health and Safety Act, a provision contained in the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Congress appropriated $20 million to build a year-round marine-road transportation system between King Cove and Cold Bay. In 2003, the U.S. Army Corps of Engineers (with the Service as cooperating agency) issued a Final EIS for the "King Cove Access Project," analyzing alternatives that would satisfy the project's purpose and need. At KCC's request, the Corps included Alternative 6, building a road through Izembek Refuge and Wilderness, for comparison purposes only. The Corps rejected Alternative 6 as a non-practicable alternative because construction and operation of a new road through Izembek Wilderness without presidential and congressional approval of a right-of-way under ANILCA Title XI "would be in violation of the provisions of the Wilderness Act."

75.    In 2009, Congress passed the Omnibus Public Lands

Management Act (OPLMA), Pub. L. No. 111-11, 123 Stat. 991 (2009), which directed the Secretary of Interior to undertake an environmental impact statement under the National Environmental Policy Act (NEPA) to analyze a proposed land exchange, the potential construction and operation of a road between King Cove and Cold Bay, and the specific road corridor identified through the Refuge. *Id.* § 6402(b).

76.    Congress explicitly authorized Federal Defendants to execute a specific exchange of federal land within Izembek for the purposes of constructing a road between King Cove and Cold Bay after conducting the required analysis only upon a finding that the exchange would serve the public interest. *Id.* § 6402(d)(1).

77.    Congress defined the terms of that exchange and described the exact parcels of land to be exchanged. *Id.* §§ 6401(2) (federal lands), 6401(4) (non-federal lands). Congress explicitly directed that if the land exchange occurred, the Izembek Wilderness boundary would be modified to exclude the dispositioned road corridor and to add the land acquired by Federal Defendants to the Izembek National Wildlife Refuge Wilderness, to be administered pursuant to the Wilderness Act. *Id.* § 6404.

78.    Pursuant to the direction to analyze the proposed exchange and planned road, Federal Defendants prepared an EIS. In a Record of Decision (ROD) in 2013, Interior Secretary Sally Jewell declined the land exchange,

concluding that the road would adversely affect wildlife, unique habitat, and the wilderness value of the area. She found that the no-action alternative "preserves the integrity of the Izembek Refuge and Izembek Wilderness, ensures continued protection of unique and internationally recognized habitats, and maintains the integrity, of designated Wilderness."

79.     In the 2013 ROD, Federal Defendants determined that this rejection of the land exchange complied with their obligations under the Refuge Act and "best satisfie[d] Refuge purposes and best accomplishe[d] the mission of the Service and the goals of Congress in ANILCA."

80.     Federal Defendants also determined that the proposed land exchange/road corridor would "diminish the ability of the Service to meet the objectives of the Wilderness Act to protect and preserve the wilderness character of the surrounding area and to administer it for the use and enjoyment of the American people in a way that will leave the lands unimpaired for future use and enjoyment as wilderness." They concluded that "The impact of road construction on wilderness character would radiate far beyond the footprint of the road corridor" and ultimately "irreparably and significantly impair this spectacular Wilderness refuge."

81.     Proponents of the land exchange challenged Federal Defendants' 2013 decision in federal court in *Agdaagux Tribe of King Cove v. Jewell*, Civ. No. 3:14-cv-0110-HRH (D. Alaska). Defenders of Wildlife, along with coalition

partners, intervened to defend the decision.

82. The Court upheld the Secretary's decision rejecting the land exchange. *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D.Alaska 2015). Plaintiffs appealed the case to the Ninth Circuit but voluntarily dismissed that appeal before a merits ruling.

83. The OPLMA's legislative authority to construct a road through Izembek Wilderness expired in 2016. Pub. L. No. 11-11, § 6406, 123 Stat. 991, 1182 (2009).

84. After a change in administration and a change in position, Federal Defendants under the first Trump administration issued a land exchange agreement for a road through Izembek on January 22, 2018. For the first time, Federal Defendants invoked the alleged authority under ANILCA's land exchange provision to enter into the agreement.

85. Federal Defendants did not conduct a comprehensive environmental analysis for this exchange.

86. Defenders of Wildlife, with its coalition partners, challenged that land exchange agreement. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, Civ. No. 3:18-cv-00029-SLG (D. Alaska).

87. On March 29, 2019, this Court ruled in favor of the plaintiffs, finding the land exchange unlawful under the APA because Federal Defendants failed to justify their change in policy from the prior

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319

administration's decision rejecting the exchange. The Court vacated the land exchange agreement. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019). Proponents of the land exchange appealed to the Ninth Circuit but voluntarily dismissed the appeal before a merits ruling.

88.　While the case was on appeal, Federal Defendants issued a second land exchange agreement on July 12, 2019, again invoking their alleged authority under ANILCA's land exchange provision to enter into the agreement.

89.　Again, Federal Defendants did not conduct a comprehensive environmental analysis.

90.　Defenders of Wildlife, in coalition with the same groups in the earlier cases, challenged the second land exchange agreement. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, Civ. No. 3:19-cv-00216-JWS (D. Alaska).

91.　On June 1, 2020, the district court ruled in favor of the plaintiffs, finding that the land exchange violated ANILCA for both fail[ing] to advance the stated purposes of ANILCA and because "it was executed without following the procedural mandates of Title XI of ANILCA" and vacating the land exchange agreement. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011 (D. Alaska 2020).

92. Proponents of the land exchange filed an appeal and obtained a 2-1 panel ruling overturning the district court decision. *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432 (9th Cir. 2022). The conservation group intervenors petitioned for rehearing *en banc*. The Ninth Circuit granted that petition and vacated the panel decision. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 54 F.4th 608 (9th Cir. 2022).

93. Before the *en banc* court issued its decision, Federal Defendants under the Biden administration withdrew the challenged land exchange agreement for "containing several procedural flaws and [being] not consistent with Departmental policy."

94. The Ninth Circuit subsequently dismissed the challenge to the 2019 land exchange agreement as moot and vacated all decisions in the case. *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, Civ. No. 20-35721, 2023 WL 4066653 (9th Cir. June 15, 2023).

95. A year and a half after withdrawing the 2019 land exchange agreement, Federal Defendants published a Draft Supplemental Environmental Impact Statement (2024 DSEIS) building off the 2013 Final EIS.

96. The 2024 DSEIS was the first environmental analysis of the proposed land exchange since the 2013 EIS. It was also the first environmental analysis to evaluate the proposed exchange under the alleged

authority of ANILCA's land exchange provision.

97. The 2024 DSEIS added language describing the relevant legal standards for evaluating the land exchange under ANILCA and the Refuge Act:

> Any land exchange under ANILCA Section 1302(h) (16 U.S.C. § 3192(h)(1)) must further the purposes of ANILCA (i.e., the conservation purpose as described in 16 U.S.C. § 3101(b) and the subsistence purpose in 16 U.S.C. § 3101(c)) when considering the exchange as a whole, including known planned uses for the divested land, to determine whether the exchange would likely result in an overall conservation or subsistence benefit.

> Additionally, ANILCA states that each refuge shall be administered, subject to valid existing rights, in accordance with the laws governing the administration of units of the National Wildlife Refuge System and ANILCA. . . . Further, in administering the National Wildlife Refuge System, each refuge shall be managed to fulfill the mission as well as the specific purposes for which the refuge is established.

> Therefore, refuge land exchanges must fulfill the conservation mission of the Refuge System and the purposes of the individual refuge. When evaluating a potential exchange, the Service will consider the exchange as a whole, including known planned uses for the divested land, and determine whether the exchange would likely result in an overall conservation benefit for both the Refuge System and individual refuge.

The 2024 DSEIS did not include new language about Federal Defendants' obligations under the Wilderness Act.

98. Defenders signed a comprehensive comment letter opposing the proposed land exchange, cosigned by Center for Biological Diversity, National Audubon Society, National Wildlife Refuge Association, Sierra Club, Alaska

Wilderness League, Wilderness Watch, The Wilderness Society, and Friends of Alaska National Wildlife Refuges, and prepared with assistance from Trustees for Alaska.

99.    These comments emphasized that the proposed exchange would violate Federal Defendants' statutory obligations under the Refuge Act and Wilderness Act, as well as other statutory obligations.

100.    Federal Defendants never finalized the NEPA process initiated by the 2024 DSEIS.

**The 2025 Decision Document, 2025 Agreement, and Exchange of Patent and Warranty Deed**

101.    On January 20, 2025, President Trump issued Executive Order 14153, titled "Unleashing Alaska's Extraordinary Resource Potential." Among other things, it directed the Secretary to "exercise all lawful authority and discretion available to him and take all necessary steps" to "facilitate the expedited development of a road corridor between the community of King Cove and the all-weather airport located in Cold Bay." E.O. 14153 § 3(b)(xi).

102.    In July 2025, Federal Defendants issued a "Draft ANILCA Section 810 Analysis of Subsistence Impacts for the Proposed Road Corridor Izembek National Wildlife Refuge, Alaska." This document described a new proposed exchange that replaced the proposed land exchange described in the 2024 DSEIS, but which described the same proposed road corridor.

103.   On October 21, 2025, Secretary Burgum and Ms. Chantae Kochuten, Chief Executive Officer of KCC, signed the 2025 Agreement.

104.   The 2025 Agreement described the lands to be exchanged as well as the acreage to which KCC agreed to relinquish its selection rights under the Alaska Native Claims Settlement Act. Federal Defendants agreed to pay KCC an undisclosed amount under the cost equalization provision of ANILCA's land exchange provision.

105.   Also on October 21, 2025, on behalf of the United States, an official of the Bureau of Land Management, an agency within the Department of the Interior, issued Patent 50-2026-0001 to KCC for the federal lands described in the 2025 Agreement.

106.   On October 22, 2025, KCC issued a warranty deed to Federal Defendants for the KCC lands described in the 2025 Agreement. An official of the Service accepted the warranty deed on behalf of the United States the same day.

107.   On October 23, 2025, copies of the 2025 Agreement, along with copies of the patent Federal Defendants issued to KCC, the warranty deed KCC issued to Federal Defendants, and a document signed by Secretary Burgum on October 21, 2025, titled "Decision of the Secretary Concerning a Proposed Land Exchange Between the Secretary of the Interior and King Cove Corporation Involving Lands Within Izembek National Wildlife Refuge,

Alaska" (2025 Decision) were made public. The 2025 Decision includes a final 810 Analysis. The 2025 Decision also includes a summary of comments on the 2024 DSEIS.

108.    The 2025 Agreement memorializes Federal Defendants' commitment to transfer approximately 484 acres of surface and subsurface estate interests in both wilderness and non-wilderness refuge lands in Izembek to KCC in exchange for approximately 1,739 acres of land owned by KCC within the boundaries of Izembek Refuge.

109.    The approximately 484 acres that Federal Defendants disposed of by patent as per the 2025 Agreement create a 18.9-mile corridor through the heart of Izembek National Wildlife Refuge and Wilderness. Roughly 336 acres of these lands were congressionally designated wilderness.

110.    The road corridor is designed to accommodate a 13-foot-wide, single-lane gravel road and approximately 113 turnouts. The planned road includes one bridge, seven culverts or small bridges, and 62 cross-drainage culverts.

111.    The selection includes space for twelve material sites within Izembek from which gravel will be mined to build the planned road.

112.    The planned road has a total footprint of 186 acres of directly altered landscape comprising the road, turnouts, culverts and material sites.

113.    The 2025 Agreement asserts that the 2025 Decision "do[es] not

authorize construction of a road" and "[a]ny subsequent decision by KCC to pursue a road connection is separate and distinct from the land exchange authorized here."

114. However, the 2025 Agreement explicitly states that the exchange "would allow KCC to pursue the construction and operation of a . . . road from King Cove to the airport in Cold Bay."

115. Moreover, in publicly signing an acknowledgment that the federal and non-federal lands had been exchanged, Secretary Burgum stated "with this land exchange [KCC] actually owns the land and is able to build the King Cove Road[.] They are the owners of this land, they are then able to proceed with this construction[.]"

116. The federal lands transferred out of Izembek Refuge and Wilderness for a road corridor is the same route identified as Alternative 2 in the 2013 EIS. It is also the same route identified as Alternative 6 in the 2024 DSEIS.

117. The 2025 Agreement does not include any restriction on commercial usage of the road, contrary to the exchange as considered in the 2024 DSEIS and the 2009 OPLMA. Nor does the 2025 Agreement include specific mitigation measures to deter ATVs from using the road corridor to gain illegal access to Izembek, as was contemplated in the proposed exchange analyzed in the 2024 DSEIS.

118.   The 2025 Decision states that the Secretary fully considered the 2013 FEIS, 2024 DSEIS, 2024 Draft 810 Analysis, and 2025 Draft 810 Analysis, among other documents. Federal Defendants cite the 2024 DSEIS throughout the 2025 Decision for its factual findings on the Refuge's environment, history of road efforts at Izembek, evaluation of the land exchange, the resource values of Izembek, construction impacts, road usage impacts, wilderness impacts, and subsistence impacts.

119.   The 2025 Decision asserts that Federal Defendants executed the 2025 Agreement pursuant to ANILCA's land exchange provision.  The 2025 Decision asserts that Federal Defendants' consideration under ANILCA's land exchange provision integrated a balancing of ANILCA purposes, including Section 101(d)'s economic and social needs purpose.

120.   The 2025 Agreement and 2025 Decision rely solely on ANILCA Section 1302(h) and do not cite any other statutory authority for executing the 2025 Agreement and effectuating the land exchange or any other statutes with which Federal Defendants complied.

121.   In invoking its alleged land exchange authority under ANILCA, Federal Defendants failed to follow ANILCA Title XI's exclusive procedures for issuing rights-of-way for transportation corridors through conservation system units, explicitly including wilderness areas.

122.   The 2025 Decision disavows any obligation to comply with the

Refuge Act: "In reaching my decision, I have not made the determination identified in the 2024 Draft SEIS as being required by the provisions of the [Refuge Act]." Further, the Decision states: "I disagree with the provision in the 2024 Draft SEIS that states that the land exchange must further the missions of the Izembek Refuge and the Refuge System."

123.   The 2025 Decision fails to include any discussion of whether the decision to enter into the 2025 Agreement complies with Refuge Act obligations to: (1) exchange away only lands that are found suitable for disposition; (2) further the purposes of the Izembek Refuge; (3) further the mission of the Refuge System; and (4) comply with other requirements of the Refuge Act as established in 16 U.S.C. § 668dd(a)(4)(A), (B), (C), and (F).

124.   The 2025 Decision acknowledges Federal Defendants' obligation to manage wilderness areas consistent with the Wilderness Act, including the prohibition on any permanent road within a wilderness area.

125.   The 2025 Decision fails to acknowledge the Wilderness Act's prohibition on any commercial enterprise within wilderness.

126.   The 2025 Decision expressly declined to put any restriction on commercial use of the planned road.

127.   The 2025 Decision purports to excuse Federal Defendants from the requirement to comply with the prohibition on a permanent road within wilderness based on the rationale that "this Decision to enter into the

Proposed land Exchange will result in the conveyance of the U.S. Exchange Lands to KCC and out of the Izembek Wilderness."

128.   The 2025 Decision fails to acknowledge that, when constructed as planned, the permanent road connecting King Cove and Cold Bay will lie within Izembek Wilderness to either side for much of its length.

129.   The 2025 Decision acknowledges that "[i]f the proposed road is constructed and operated, there will be some additional impacts on the wilderness characteristics of the adjoining areas that remain wilderness." The 2025 Decision characterizes those impacts as "limited because any road will be constrained to a single-land gravel road and associated material sites are largely associated only with the construction of the road."

130.   The 2025 Decision fails to rationally explain how the 2025 Agreement complies with the Wilderness Act regarding impacts from the planned road that will lie within Izembek Wilderness to the wilderness character of adjoining Izembek Wilderness lands.

131.   The 2025 Decision expressly declined to require a barrier along the road to restrict access to adjoining Izembek Refuge and Wilderness lands from the road corridor.

132.   The 2025 Decision, 2025 Agreement, the issuance of the patent, and the acceptance of the warranty deed constitute final agency actions by Federal Defendants within the meaning of the APA.

## The Planned Road's Impacts on Izembek

133.   As Federal Defendants have previously concluded in numerous documents, the planned road is expected to have significant environmental impacts that will disrupt wildlife, degrade ecosystems and habitat, and destroy or degrade wilderness character and values. Those harms will adversely affect a significant area outside of the road corridor, with anticipated long-term changes to the hydrology and ecosystem of the Refuge.

134.   Even before road construction begins, privatization of the road corridor and loss of federal protections for that land is likely to immediately harm Izembek's wildlife, the ecosystem of the isthmus and lagoon complex, and its wilderness character.

135.   Decades of analysis of a potential road through Izembek have identified significant wildlife impacts, including, but not limited to, crossing key nesting and molting habitats for tundra swans; crossing a major caribou migration corridor at the expense of reducing productivity of the Southern Alaska Peninsula caribou herd; displacing waterfowl to less desirable and protective habitat at the expense of increased mortality and decreased productivity; degradation of key brown bear habitat; and disturbance of waterfowl populations at critical times.

136.   Construction of the planned road through Izembek's wetlands will fragment ecologically sensitive habitat and degrade the integrity of the

Izembek Lagoon complex and eelgrass beds that host hundreds of thousands of migratory birds each year.

137. Increased human access to these lands using ATVs will permanently damage both tundra and wetland habitats and affect waterfowl and mammals' use of that habitat for nesting, feeding, transiting, and foraging.

138. Imperiled species, including the ESA-listed Southwest Alaska distinct population segment of the northern sea otter, Steller sea lion, and Steller's eider, are expected to suffer additional adverse consequences from the construction and use of the planned road.

139. Additionally, vulnerable waterfowl such as Pacific black brant, emperor geese, and tundra swans would be susceptible to increased unauthorized harvest caused by increased access to currently difficult-to-access lagoon areas.

140. Construction of the planned road through Izembek's watersheds that are hydrologically connected to the Izembek and Kinzarof Lagoons will degrade that ecosystem significantly.

141. Both construction and use of the planned road will increase silt loads from erosion, permanently degrading the currently pristine water quality of the connected wetland ecosystem.

142. Decreased water quality will negatively affect the eelgrass beds

contained in the lagoons that support both resident and migratory birds.

143. Decreased water quality will negatively affect aquatic wildlife, including fish and marine mammals.

144. The wildlife impacts will not only harm the species themselves, but also the people who currently rely on Izembek's fish, waterfowl, and caribou populations for subsistence as those resources become displaced or diminished. Decreases in those species will also diminish opportunities for recreational hunters.

145. These wildlife impacts will also adversely affect the interests of those who use and enjoy Izembek for its unparalleled biodiversity, including through recreation, photography and videography, hiking, boating, and other such pursuits.

146. The planned road through Izembek will significantly degrade the wilderness character of Izembek's wilderness lands, both adjacent to the road corridor and in the Refuge's interior wilderness areas.

147. During construction, heavy equipment will be clearly visible from adjacent wilderness lands, creating significant noise, disrupting and destroying the wilderness character of the area.

148. After construction, the road will increase access both along the road and deeper into Izembek, be visible from adjacent wilderness lands, and create road noise.

149.   Increased access to the heart of Izembek via the road corridor will increase opportunities for illegal poaching and illegal ATV use within wilderness.

150.   Izembek is recognized for its unique and significant wilderness values. These expected impacts from the planned road running within Izembek Wilderness will substantially reduce its untrammeled, natural, and undeveloped qualities.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Federal Defendants Violated the Refuge Act by Failing To Determine that the Izembek Lands Exchanged Out of the System Are Suitable for Disposition

### (16 U.S.C. § 668dd(b)(3); 5 U.S.C. § 706(2))

151.   Plaintiff hereby realleges and incorporates each allegation set forth in paragraphs 1–150.

152.   ANILCA provides that Refuge lands designated in Title III "shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act." ANILCA § 304(a).

153.   ANILCA's grant of general authority to "acquire by purchase, donation, exchange, or otherwise any lands" is limited to where the exercise of that authority is "consistent with other applicable law." 16 U.S.C. §

3192(a).

154.    Federal Defendants must meet the standards for conducting a land exchange under ANILCA—namely, the directive that such exchange be conducted to carry out the conservation and subsistence purposes of the statute. *Id.*

155.    To ensure "consisten[cy] with other applicable law," *id.* § 1302(a), Federal Defendants must also meet all the Refuge Act's requirements for conducting a land exchange, to the extent those requirements are not in direct conflict with ANILCA section 1302(h), 16 U.S.C. § 3192(h).

156.    ANILCA section 1302(h) relieves Federal Defendants of their Refuge Act obligation to ensure that the values of properties to be exchanged are of approximately equal value or are otherwise equalized by cash payment. 16 U.S.C. § 668dd(b)(3). It does not relieve Federal Defendants of any other Refuge Act requirement applicable to a land exchange.

157.    The Refuge Act requires that Federal Defendants may only exchange those lands out of the National Wildlife Refuge System that they find are "suitable for disposition." 16 U.S.C. § 668dd(b)(3).

158.    Federal Defendants acknowledged this requirement in the 2024 DSEIS.

159.    The 2025 Decision explicitly disavows any obligation to comply with the Refuge Act.

160. Federal Defendants failed to determine that the federal lands in Izembek Refuge and Wilderness conveyed to KCC are suitable for disposition.

161. Federal Defendants' Refuge Act violation renders their final agency actions unlawful under the APA, 5. U.S.C. § 706(2).

## SECOND CLAIM

**Federal Defendants Violated the Refuge Act's Requirements to Manage Izembek Refuge to Fulfill Its Purposes and the Mission of the System, and to Comply with Management Directives**

**(16 U.S.C. §§ 668dd(a)(3)(A), 668dd(a)(4)(A)–(D), (F); 5 U.S.C. § 706(2))**

162. Plaintiff hereby realleges and incorporates each allegation set forth in paragraphs 1–150.

163. ANILCA affirmatively directs Federal Defendants to manage Refuge lands in Alaska in accordance with the Refuge Act. *See* ANILCA § 304(a). ANILCA's land acquisition authority is explicitly conditioned on being consistent with other applicable law. 16 U.S.C. § 3192(a).

164. The Refuge Act requires Federal Defendants to manage each refuge "to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A); *see also id.* § 668dd(a)(4)(D).

165. Congress established the mission of the System as administering "a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources

and their habitats." *Id.* § 668dd(a)(2).

166.    Congress ordered that Federal Defendants shall, in administering the System, comply with other relevant management directives. *Id.* § 668dd(a)(4)(A), (B), (C), (F).

167.    Izembek has five purposes: (1) "to conserve fish and wildlife populations and habitats in their natural diversity," (2) "to fulfill the international treaty obligations . . . with respect to fish and wildlife," (3) "to provide for . . . the opportunity for continued subsistence uses," (4) "to ensure . . . water quality and necessary water quantity within the refuge," and (5) to serve the purposes of the Wilderness Act. ANILCA § 303(3)(B); 16 U.S.C. § 1133(a); 50 C.F.R. § 25.12(a); *id.* § 35.2(a).

168.    The 2025 Decision disavows Federal Defendants' obligations to comply with the Refuge Act in executing the 2025 Agreement and effectuating the land exchange.

169.    Federal Defendants' final agency actions violate the Refuge Act by failing to manage Izembek Refuge to fulfill its specific purposes, including its wilderness purposes.

170.    Federal Defendants' final agency actions violate the Refuge Act by failing to manage Izembek Refuge to fulfill the mission of the National Wildlife Refuge System.

171.    Federal Defendants' final agency actions violate the Refuge Act

by failing to manage Izembek Refuge to "provide for the conservation of fish, wildlife, and plants, and their habitats within the System." 16 U.S.C. § 668dd(a)(4)(A).

172.    Federal Defendants' final agency actions violate the Refuge Act by failing to manage Izembek Refuge to "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(4)(B).

173.    Federal Defendants' final agency actions violate the Refuge Act by failing to manage Izembek Refuge to "plan and direct the continued growth of the System in a manner that is best designed to accomplish the mission of the System [and] to contribute to the conservation of the ecosystems of the United States[.]" 16 U.S.C. § 668dd(a)(4)(C).

174.    Federal Defendants' final agency actions violate the Refuge Act by failing to manage Izembek Refuge to "assist in the maintenance of adequate water quantity and water quality to fulfill the mission of the System and the purposes of" Izembek Refuge. *Id.* 16 U.S.C. § 668dd(a)(4)(F).

175.    These Refuge Act violations render Federal Defendants' final agency actions unlawful under the APA, 5 U.S.C. § 706(2).

## THIRD CLAIM

## Federal Defendants Violated the Wilderness Act's Prohibitions by Enabling a Permanent Road and Commercial Enterprise Within Izembek Wilderness

## (16 U.S.C. § 1133(c); 5 U.S.C. § 706(2))

176. Plaintiff hereby realleges and incorporates each allegation set forth in paragraphs 1–150.

177. In enacting the Wilderness Act, Congress intentionally designed "a legislatively authorized wilderness preservation system" to "assure that no future administrator could arbitrarily or capriciously . . . abolish wilderness areas that should be retained[.]" H.R. Rep. No. 88-1538 at 3616–17.

178. In enacting ANILCA, Congress stated that wilderness lands "shall be administered in accordance with applicable provisions of the Wilderness Act" except as otherwise "*expressly provided* for in this Act." ANILCA § 707 (emphasis added).

179. None of ANILCA's express exceptions to the Wilderness Act permit Federal Defendants to enable a permanent road to be constructed within a wilderness area, unless specifically authorized by Congress through Title XI. 16 U.S.C. § 3166(b)–(c).

180. The Wilderness Act's prohibitions against permanent roads and commercial enterprises within wilderness areas are absolute. They cannot be circumvented by removing wilderness lands from the National Wilderness

System by transferring them to a third party via an ANILCA land exchange.

181.   The 2025 Decision explicitly acknowledges that Federal Defendants would transfer Izembek Wilderness lands to KCC to enable it to build a road through Izembek.

182.   The 2025 Decision expressly declines to put any restrictions on commercial use of the King Cove road in the 2025 Agreement.

183.   In executing the 2025 Exchange Agreement, Federal Defendants agreed to convey 336 acres of Izembek Wilderness lands to KCC. Upon conveyance of Patent 50-2026-001 to KCC, these wilderness lands became KCC's private property.

184.   Even though the road connecting King Cove and Cold Bay is planned to be built on private property, it will be adjoined by Izembek Wilderness lands on either side for much of its length.

185.   The planned road connecting King Cove and Cold Bay will lie within Izembek Wilderness for much of its length.

186.   Federal Defendants' final agency actions in exchanging lands out of Izembek Wilderness to facilitate the planned road will enable construction of a permanent road within Izembek Wilderness, in violation of the Wilderness Act.

187.   Federal Defendants' final agency actions will enable commercial enterprises to utilize the planned road within Izembek Wilderness, in

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319

violation of the Wilderness Act.

188. Federal Defendants' final agency actions violate the Wilderness Act and are unlawful under the APA, 5 U.S.C. § 706(2).

## FOURTH CLAIM

### Federal Defendants Violated the Wilderness Act's Obligations to Preserve Izembek's Wilderness Character

### (16 U.S.C. §§ 1131(a), 1131(c), 1133(b); 5 U.S.C. § 706(2))

189. Plaintiff hereby realleges and incorporates each allegation set forth in paragraphs 1–150.

190. In the Wilderness Act, Congress established the National Wilderness Preservation System, composed of congressionally designated wilderness areas to be administered "for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, [and] the preservation of their wilderness character[.]" 16 U.S.C. § 1131(a).

191. Congress defined wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain," and as "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its

natural conditions[.]" *Id.* § 1131(c).

192.   Congress directed that each agency "administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." *Id.* § 1133(b); *see also id.* § 1133(a) ("The purposes of this chapter are hereby declared to be within and supplemental to the purposes" for which units of the "national wildlife refuge system[]" is administered).

193.   The 2025 Decision fails to draw a rational connection between the facts before Federal Defendants and the conclusion that entering into the 2025 Agreement for the purpose of enabling KCC to construct a road within Izembek Wilderness will have no more than limited impacts on the adjoining areas that remain wilderness "because any road will be constrained to a single-land gravel road and associated material sites are largely associated only with the construction of the road."

194.   Federal Defendants' final agency actions have violated their Wilderness Act responsibility to preserve Izembek Wilderness's wilderness character and to devote it to the public purposes specified in the statute.

195.   Federal Defendants' final agency actions violate the Wilderness Act and are unlawful under the APA, 5 U.S.C. § 706(2).

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

A.      Declare that Federal Defendants' final agency actions violate the Refuge Act because they have failed to determine that the lands exchanged out of Izembek Refuge were suitable for disposition;

B.      Declare that Federal Defendants' final agency actions violate the Refuge Act because they have failed to manage Izembek Refuge to fulfill its five specific purposes;

C.      Declare that Federal Defendants' final agency actions violate the Refuge Act because they have failed to manage Izembek Refuge to fulfill the mission of the National Wildlife Refuge System;

D.      Declare that Federal Defendants' final agency actions violate the Refuge Act because they have failed to comply with the Refuge Act's directives to manage Izembek pursuant to the directives set forth in 16 U.S.C. § 668dd(a)(4)(A), (B), (C), and (F).;

E.      Declare that Federal Defendants' final agency actions violate the Wilderness Act by enabling a permanent road and commercial enterprise within Izembek Wilderness;

F.      Declare that Federal Defendants' final agency actions are unlawful under the Wilderness Act for arbitrarily concluding that the planned road will have limited impacts on Izembek Wilderness and by failing

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319

53

to preserve the wilderness character of Izembek's wilderness lands;

G.     Vacate the 2025 Decision and 2025 Agreement;

H.     Invalidate Federal Defendants' issuance of U.S. Patent No. 50-2026-0001 (Oct. 22, 2025), to KCC and Federal Defendants' acceptance of the warranty deed, Record No. 2025-000209-0, Recording District: 305 – Aleutian Islands (Oct. 22, 2025), issued by KCC to the United States;

I.     Enter appropriate preliminary and permanent injunctive relief;

J.     Award Plaintiff its reasonable costs, and expenses, including attorneys' fees, associated with the litigation; and

K.     Award Plaintiff such further and additional relief as this Court deems just and proper.

Respectfully submitted this 12th day of November, 2025.

<div style="margin-left:50%">

*/s/ Jane P. Davenport*
Jane P. Davenport (*pro hac vice pending\**)
Daniel Franz (*pro hac vice pending\**)
Defenders of Wildlife
1130 17th St. NW
Washington, DC 20036
(202) 682-9400 (tel)
jdavenport@defenders.org
dfranz@defenders.org

*Attorneys for Plaintiff Defenders of Wildlife*

\* Attorneys will submit their *pro*

</div>

*hac vice* materials immediately upon the case being assigned a number and the docket becoming available in PACER.