Jane P. Davenport (pro hac vice)
Daniel Franz (pro hac vice)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400 (tel)
jdavenport@defenders.org
dfranz@defenders.org

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

|  |  |
|---|---|
| DEFENDERS OF WILDLIFE, | Case No. 3:25-cv-00319-SLG |
|    Plaintiff, | |
|        v. | |
| DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; BRIAN NESVIK, in his official capacity as Director of the U.S. Fish and Wildlife Service; and KING COVE CORPORATION, an Alaska Native Village Corporation, | |
|    Defendants, | |
|       and | |
| STATE OF ALASKA, | |
|    Intervenor-Defendant. | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM IN SUPPORT

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

TABLE OF ACRONYMS/ABBREVIATIONS ................................................. viii

LIST OF EXHIBITS ....................................................................... x

INTRODUCTION ......................................................................... 1

BACKGROUND ........................................................................... 2

    A. Izembek's Incomparable Wildlife and Wilderness Conservation
       Values ............................................................................. 2

    B. Conservation Impacts of a Road Through Izembek's Heart ............... 3

    C. Legal Framework for Managing Izembek Refuge and
       Wilderness ....................................................................... 6

       1. Wilderness Act of 1964 ................................................. 6

       2. National Wildlife Refuge System Administration Act of 1966 ........ 8

       3. Alaska National Interest Lands Conservation Act of 1980 ........... 9

       4. National Wildlife Refuge System Improvement Act of 1997 ......... 13

    D. Federal Defendants' Unlawful Land Exchange With KCC ............... 15

STANDING ............................................................................... 22

STANDARD OF REVIEW ................................................................. 23

ARGUMENT ............................................................................. 24

    I. Federal Defendants Failed to Determine that the Lands
       Exchanged Out of Izembek Refuge Are Suitable for Disposition as
       the Refuge Act Requires ..................................................... 26

    II. Federal Defendants Failed to Ensure Consistency with the
       Refuge Act's Mandatory Management Directives .......................... 30

      A. Impacts on Species and Habitat Conservation ......................... 32

      B. Impacts on Migratory Waterfowl Conservation and Water
        Quality and Quantity .................................................... 35

      C. Impacts on Subsistence Uses .......................................... 36

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

    D. Destruction and Degradation of Wilderness Character In and Adjacent to Road Corridor ................................................................. 37

III. Federal Defendants Violated the Wilderness Act by Enabling a Permanent Road and Commercial Enterprise Within Izembek Wilderness .......................................................................................... 38

IV. Federal Defendants Violated the Wilderness Act's Mandate to Preserve Izembek's Wilderness Character by Arbitrarily Concluding that the Road Will Have Limited Impacts ........................ 43

CONCLUSION .............................................................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Cattle Growers' Ass'n v. USFWS,*
    273 F.3d 1229 (9th Cir. 2001) ........................................................ 24

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt,*
    463 F. Supp. 3d 1011 (D. Alaska 2020) ....................................... 40

*Friends of Alaska Nat'l Wildlife Refuges v. Haaland,*
    29 F.4th 432 (9th Cir. 2022) ........................................................ 40

*Friends of Alaska Nat'l Wildlife Refuges v. Haaland,*
    Civ. No. 20-35721, 2023 WL 4066653 (9th Cir. June 15, 2023) ............... 16

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt,*
    381 F. Supp. 3d 1127 (D. Alaska 2019) ....................................... 15

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ........................................................ 22

*Gerber v. Norton,*
    294 F.3d 173 (D.C. Cir. 2002) ........................................................ 26

*League of Conservation Voters v. Trump,*
    363 F. Supp. 3d 1013 (D. Alaska 2019) ....................................... 24

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ........................................................ 24, 27

*Mass. v. EPA,*
    549 U.S. 497 (2007) ........................................................ 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) ........................................................ 23

*Nat'l Fed. of Indep. Bus. v. Dep't of Labor,*
    595 U.S. 109 (2022) ........................................................ 25

*Or. Nat. Res. Council v. Thomas,*
    92 F.3d 792 (9th Cir. 1996) ........................................................ 39

*Silver v. N.Y. Stock Exchange,*
 373 U.S. 341 (1963) ................................................................ 24

*Sioux Tribe of Indians v. U.S.,*
 316 U.S. 317 (1942) ................................................................ 25

*U.S. v. Borden Co.,*
 308 U.S. 188 (1939) ................................................................ 24

*U.S. v. Novak,*
 476 F.3d 1041 (9th Cir. 2007) ................................................ 39

*U.S. v. City & Cty. of San Francisco,*
 310 U.S. 16 (1940) ............................................................ 25, 39

*Wilderness Soc. v. Morton,*
 479 F.2d 842 (D.C. Cir. 1973) ................................................ 25

## Statutes

5 U.S.C. § 706(2) ........................................................................ 23

16 U.S.C. § 668dd(a) ........................................................... *passim*

16 U.S.C. § 668dd(b)(3) ................................................... 9, 26, 40

16 U.S.C. § 688dd(e)(1)(A) ...................................................... 14

16 U.S.C. § 1131(a) ..................................................................... 6

16 U.S.C. § 1131(c) ............................................................... 7, 44

16 U.S.C. § 1133(a) ............................................................. *passim*

16 U.S.C. § 1133(b) ................................................... 7, 8, 43, 47

16 U.S.C. § 1133(c) ............................................................... 8, 38

16 U.S.C. § 3101(a) ..................................................................... 9

16 U.S.C. § 3101(b) ............................................................... 9, 10

16 U.S.C. § 3101(c) ................................................................... 10

16 U.S.C. § 3101(d) ....................................................... 27, 28, 29

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

16 U.S.C. § 3150(a) ................................................................. 42

16 U.S.C. § 3161(c) ................................................................. 11

16 U.S.C. § 3162(1) ................................................................. 41

16 U.S.C. § 3164 ............................................................... 11, 41

16 U.S.C. § 3166 ......................................................... 11, 41, 42

16 U.S.C. § 3192(a) ...........................................................*passim*

16 U.S.C. § 3192(h) ......................................... 12, 18, 27, 40

16 U.S.C. § 3199 ..................................................................... 42

16 U.S.C. § 3203 ..................................................................... 42

Pub. L. 105-57 (Improvement Act) § 5(b) ........................... 29

Pub. L. 105-57 (Improvement Act) § 9 ............................ 14, 15

Pub. L. No. 96-487 (ANILCA) § 203 ................................... 30

Pub. L. No. 96-487 (ANILCA) § 302 ................................... 10

Pub. L. No. 96-487 (ANILCA) § 303 .............................*passim*

Pub. L. No. 96-487 (ANILCA) § 303(3) ...................... 2, 3, 28

Pub. L. No. 96-487 (ANILCA) § 304(a) ........................*passim*

Pub. L. No. 96-487 (ANILCA) § 304(c) ............................... 10

Pub. L. No. 96-487 (ANILCA) § 304(d) ............................... 10

Pub. L. No. 96-487 (ANILCA) § 304(e) ............................... 10

Pub. L. No. 96-487 (ANILCA) § 304(g) ............................... 10

Pub. L. No. 96-487 (ANILCA) § 503(c) ............................... 30

Pub. L. No. 96-487 (ANILCA) § 702 .............................. 3, 11

Pub. L. No. 96-487 (ANILCA) § 707 ....................... 11, 30, 41

**Other Authorities**

U.S. Const., art. VI, § 3, cl. 2 ................................................................ 24, 25

43 C.F.R. § 36.2(b) ................................................................................. 41

43 C.F.R. § 36.7(a) ................................................................................. 41

43 C.F.R. § 36.7(b) ................................................................................. 42

43 C.F.R. § 36.9(a) ........................................................................... 41, 42

50 C.F.R. § 25.12(a) ...................................................................... 3, 14, 37

50 C.F.R. § 35.2(a) ................................................................................. 14

50 C.F.R. § 35.5 ....................................................................................... 8

Fish and Wildlife Service Manual, 342 FW 5.7B(1) ....................................... 27

Fish and Wildlife Service Manual, 603 FW 2.5(A) .......................................... 35

Fish and Wildlife Service Mnaual, 610 FW 1.5(Q) ............................................ 8

# TABLE OF ACRONYMS/ABBREVIATIONS

| | |
|---|---|
| Administration Act | National Wildlife Refuge System Administration Act of 1966 |
| Agreement | Agreement for the Exchange of Lands (2025) (beginning at LE_000180) |
| ANILCA | Alaska National Interest Lands Conservation Act |
| APA | Administrative Procedure Act |
| ATV | all-terrain vehicle |
| Coalition Comments | DSEIS Comments by Defenders of Wildlife *et al.* (beginning at CO_122312) |
| CSU | conservation system unit |
| Decision | Decision of the Secretary Concerning a Proposed Land Exchange Between the Secretary of the Interior and King Cove Corporation involving Lands Within Izembek National Wildlife Refuge, Alaska (2025) (beginning at LE_000001) |
| DSEIS | Izembek National Wildlife Refuge Land Exchange/Road Corridor Draft Supplemental Environmental Impact Statement (2024) (beginning at LE_003111) |
| Earthjustice Comment | DSEIS Comments on behalf of Chevak Native Village *et al.* (beginning at CO_130257) |
| Federal Defendants | Doug Burgum, in his official capacity as Secretary of the U.S. Department of the Interior, and Brian Nesvik, in his official capacity as Director of the U.S. Fish and Wildlife Service |
| Interior | U.S. Department of the Interior |
| Improvement Act | National Wildlife Refuge System Improvement Act of 1997 |

| Izembek | Izembek National Wildlife Refuge and National Wilderness |
| KCC | King Cove Corporation |
| Manual | U.S. Fish and Wildlife Service Manual |
| Refuge Act | National Wildlife Refuge System Administration Act of 1966 as amended by the National Wildlife Refuge System Improvement Act of 1997 |
| Service | U.S. Fish and Wildlife Service |

## LIST OF EXHIBITS

Exhibit 1      Excerpts from H.R. Rep. No. 96-97, pt. II (1979) (ANILCA)

Exhibit 2      Excerpts from S. Rep. No. 88-109 (1963) (Wilderness Act)

Exhibit 3      Excerpts from H.R. Rep. No. 88-1538 (1964) (Wilderness Act)

Exhibit 4      Excerpts from S. Rep. No. 96-413 (1979) (ANILCA)

Exhibit 5      Excerpts from H.R. Rep. No. 95-1045, pt. I (1978) (ANILCA)

Exhibit 6      Excerpts from H. R. Rep. No. 96-97, pt. I (1979) (ANILCA)

Exhibit 7      Excerpts from S. Rep. No. 95-1300 (1978) (ANILCA)

Exhibit 8      Excerpts from H. Rep. No. 105-106 (1997) (Improvement Act)

Exhibit 9      Declaration of Brianne Kristine Rogers

Exhibit 10    Declaration of Nicole Whittington-Evans

Plaintiff moves for summary judgment. Fed. R. Civ. P. 56; L. Civ. R.
16.3. Plaintiff is entitled to judgment on its claims that Federal Defendants
have violated the Refuge Act[1] and Wilderness Act by unlawfully transferring
federal lands from the Izembek National Wildlife Refuge and National
Wilderness to King Cove Corporation (KCC). The Court should grant
Plaintiff's motion and order all necessary statutory, declaratory, and
injunctive relief to remedy these violations and unwind the exchange.

## INTRODUCTION

An agency's authority to dispose of federal property is strictly limited to
those statutory powers Congress grants and is subject to the statutory
conditions Congress imposes. In the Alaska National Interest Lands
Conservation Act (ANILCA), Congress established Izembek National Wildlife
Refuge and National Wilderness and directed Federal Defendants to manage
Izembek in accordance with the Refuge Act and the Wilderness Act as well as
ANILCA to accomplish Congress' explicit purposes for Izembek. Federal
Defendants' use of ANILCA's land exchange provision to dispose of Izembek
land for a road violates these statutory mandates and must be set aside.

---

[1] Except as specifically noted, Plaintiff refers to the National Wildlife Refuge
System Administration Act of 1966 (Administration Act), as amended by the
National Wildlife Refuge System Improvement Act of 1997 (Improvement
Act), 16 U.S.C. §§ 668dd–668ee, as the "Refuge Act."

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

1

# BACKGROUND

A. <u>Izembek's Incomparable Wildlife and Wilderness Values</u>

Izembek is home to more than 200 wildlife species. The Izembek and Kinzarof Lagoons host multitudes of waterfowl annually, serving as a critical stopover for fueling long-distance migration. 2024 Izembek National Wildlife Refuge Land Exchange/Road Corridor Draft Supplemental Environmental Impact Statement (DSEIS) LE_003111, LE_004264. For terrestrial wildlife, Izembek's isthmus between the lagoons is a corridor connecting the eastern and western parts of the Refuge. The isthmus is vital to the Southern Alaska Peninsula caribou herd and other species. *Id*. at LE_003918. Izembek's Joshua Green River watershed area is prime habitat for one of the highest density populations of brown bears in Alaska. *Id*. at LE_003923. The Izembek watershed hosts salmon and other sensitive native fish species and includes spawning habitat. *Id*. at LE_004271–72.

Recognizing the importance of these ecological resources, in 1980, Congress redesignated the Izembek National Wildlife Range as Izembek National Wildlife Refuge. ANILCA § 303(3)(A).[2] Congress established Izembek Refuge's purposes:

> (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl,

---

[2] Plaintiff cites "ANILCA §" for uncodified provisions of Pub. L. No. 96-487.

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

2

shorebirds and other migratory birds, brown bears and salmonids;

(ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii) to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and

(iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

ANILCA § 303(3)(B).

In accordance with the Wilderness Act, in ANILCA Title VII, Congress designated the majority of Izembek as wilderness, ANILCA § 702(6), recognizing that:

> The Izembek Wilderness possesses outstanding scenery, key populations of brown bear, caribou and other wilderness-related wildlife, and critical watersheds to Izembek Lagoon. About 68 percent of the total lands in Izembek Lagoon are covered with the largest eelgrass beds in the world. These beds are utilized by millions of waterfowl for migration and wintering purposes. A wilderness designation will *protect this critically important habitat by restricting access to the lagoon.*

Ex. 1, H.R. Rep. No. 96-97, pt. II, at 136 (1979) (emphasis added). The Wilderness Act's purposes are an additional purpose of Izembek's refuge wilderness area. 16 U.S.C. § 1133(a); *see also* 50 C.F.R. § 25.12(a) (defining "purpose(s) of the refuge").

B. <u>Impacts of a Road Through Izembek's Heart</u>

Decades of analysis of a potential road through Izembek have identified

significant deleterious wildlife impacts, such as crossing key nesting and molting habitats for tundra swans; crossing a major caribou migration corridor with the effect of reducing productivity of the Southern Alaska Peninsula caribou herd; displacing waterfowl to less desirable and protective habitat with the effect of increasing mortality and decreasing productivity; degrading key brown bear habitat; and disturbing waterfowl populations at critical times. DSEIS at LE_003138.

The impacts will not only harm the species and habitats directly, but also those Alaskans who rely on Izembek's fish, waterfowl, and caribou populations for subsistence. DSEIS at LE_003138; *see also* DSEIS Comments on behalf of Chevak Native Village *et al.* (Earthjustice Comment), CO_130257, CO_130258–60 (describing additional, unevaluated impacts to subsistence users in Yukon-Kuskokwim Delta and Northern Bay regions). Decreases in those species will also diminish opportunities for recreational hunters, many of whom travel from out of state to hunt in Izembek.

These wildlife impacts will also adversely affect many other interests of those who use and enjoy Izembek for its unparalleled biodiversity, including through recreation, photography and videography, hiking, boating, and other such pursuits.

The lagoons and hydrologically connected wetlands have unique ecological significance both locally and globally and are considered the heart

of the refuge. Construction of the planned road through Izembek's wetlands will fragment ecologically sensitive habitat and degrade the integrity of the Izembek's lagoons and eelgrass beds. *See* DSEIS at LE_003967, LE_004266–67. Road construction and use will increase silt loads from erosion, degrading the pristine water quality of the wetland ecosystem. *Id.* at LE_003138, LE_004272. Decreased water quality will negatively affect water-dependent fish and wildlife.

Increased access via the road corridor within the refuge and refuge wilderness will also increase opportunities for illegal poaching and illegal all-terrain vehicle (ATV) use in adjacent areas. DSEIS at LE_004276, LE_004349. Illegal ATV use that already occurs in Izembek is concentrated around existing roads. *See* LE_027955–56 (aerial survey discussion). Expansion of that pattern around the road will allow illegal ATV use to penetrate new areas. Increased ATV access will permanently damage both tundra and wetland habitats, *see* DSEIS at LE_003873, LE_004268, and impair waterfowl and mammals' use of that habitat for nesting, feeding, transiting, and foraging. *Id.* at LE_004282, LE_004298.

The planned road through Izembek will significantly and permanently degrade the wilderness character of Izembek's wilderness lands, both adjacent to the road and in interior wilderness areas. *Id.* at LE_004349. During construction, heavy equipment will be clearly visible from adjacent

wilderness lands and create significant noise, disrupting and destroying the wilderness character of the area. *Id. at* LE_004347. After construction, vehicles using the road will cause noise and visual impacts inconsistent with the surrounding wilderness character. The road will also increase illegal ATV access along the road and deeper into Izembek Wilderness, bringing additional noise and visual impacts to the wilderness lands. *Id.* at LE_004349.

C. Legal Framework for Managing Izembek Refuge and Wilderness

Federal Defendants must manage Izembek pursuant to three statutes: the Wilderness Act, the Refuge Act, and ANILCA.

   1. *Wilderness Act of 1964*

The Wilderness Act, 16 U.S.C. §§ 1131–1136, established the National Wilderness Preservation System, federally reserved and withdrawn wilderness areas within national forests, national wildlife refuges, national parks, and Bureau of Land Management lands that "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas [and] the preservation of the wilderness character." *Id.* § 1131(a).

Congress defined "wilderness" to mean in part:

A wilderness, in contrast with those areas where man and his own

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this Act an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions[.]

*Id.* § 1131(c).

One of Congress's central purposes was to "assure the permanent reservation" of wilderness areas. Ex. 2, S. Rep. No. 88-109, at 3 (1963); *see also* Ex. 3, H.R. Rep. No. 88-1538, at *3615–16 (1964). Congress intentionally designed a "legislatively authorized wilderness preservation system" to "assure that no future administrator could arbitrarily or capriciously . . . abolish wilderness areas that should be retained[.]" Ex. 3 at *3616–17.

Federal agencies manage wilderness lands pursuant to the Wilderness Act and the laws governing each federal land system. The Act's purposes are within and supplemental to the purposes for which federal public lands are established and administered. 16 U.S.C. § 1133(a). Congress directed agencies to "preserv[e] the wilderness character of the area" and to "administer such area for such other purposes for which it may have been established as also to preserve its wilderness character." *Id.* § 1133(b). Under the U.S. Fish and Wildlife Service Manual's (Manual)[3] wilderness non-

_____

[3] Available at https://www.fws.gov/policy-library/manuals.

degradation policy, the "conditions prevailing" at the time of designation "establish [the] benchmark of that area's wilderness character and value." 610 FW 1.5(Q). The policy directs that the Service "will not allow the wilderness character and values of the wilderness to be degraded below that benchmark." *Id*.

Congress set strict limits on activities in wilderness. "Except as otherwise provided in this Act, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation and historical use." 16 U.S.C. § 1133(b). Congress decreed that there "shall be no commercial enterprise and no permanent road within any wilderness area" and generally "no use of motor vehicles [or] motorized equipment . . . within any such area." *Id*. § 1133(c). The Service's implementing regulations for wilderness areas within the National Wildlife Refuge System repeat the statutory prohibition on permanent roads, commercial enterprises, motor vehicles, and motorized equipment within wilderness. 50 C.F.R. § 35.5. *See also* 610 FW 2.6, 2.7A.(2).

The Wilderness Act does not authorize federal agencies to dispose of wilderness, either outright or by exchange. *See generally* 16 U.S.C. §§ 1131– 1136.

    2. *National Wildlife Refuge System Administration Act of 1966*

In 1966, the Administration Act established the National Wildlife

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

Refuge System, federal lands "administered by the Secretary of the Interior for the conservation of fish and wildlife," including "areas for the protection and conservation of fish and wildlife that are threatened with extinction," 16 U.S.C. § 668dd(a)(1). The Administration Act reserved the Secretary's general land management authority for the refuge system. *Id.* Congress provided specific standards for land exchanges "to acquire lands or interests therein" by trading "acquired lands or public lands . . . under [the Secretary's] jurisdiction which he finds suitable for disposition." *Id.* § 668dd(b)(3). It directed that "[t]he values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash[.]" *Id.*

   3. *Alaska National Interest Lands Conservation Act of 1980*

Congress enacted ANILCA, 16 U.S.C. §§ 3101–3233, to "preserve . . . certain lands and waters in the State of Alaska that contain nationally significant" values, including natural, wilderness, and wildlife values. *Id.* § 3101(a). ANILCA established new and modified "conservation system units" (CSU) in Alaska. *See id.* § 3101(a). These include units of the National Wildlife Refuge System and National Wilderness Preservation System. *Id.* § 3102(4).

ANILCA's purposes are to ensure conservation and provide for subsistence use. *Id.* § 3101(b)–(c). The conservation purpose includes

"provid[ing] for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation"; "preserv[ing] in their natural state extensive unaltered" ecosystems; protecting subsistence resources, and "preserv[ing] wilderness resource values and related recreational opportunities[.]" *Id.* § 3101(b). The subsistence purpose includes ensuring continuing subsistence opportunities for rural residents by managing "fish and wildlife in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded[.]" *Id.* § 3101(c).

Title III designated national wildlife refuges and established specific purposes for each. ANILCA §§ 302, 303. It mandates that "[e]ach refuge shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act." ANILCA § 304(a). In specific circumstances, ANILCA contains different management directives for Alaska refuge lands than does the Refuge Act. *See, e.g.*, ANILCA § 304(c) (withdrawing Refuge lands from future selections by State of Alaska and Native Corporations); *id.* § 304(d) (permitting existing valid commercial fishing rights); *id.* § 304(e) (granting authority to allow uses to maintain, enhance, and rehabilitate fish stocks); *id.* § 304(g) (refuge comprehensive conservation plan requirements).

Title VII established wilderness areas in Alaska in accordance with the

Wilderness Act. *See* ANILCA § 702. ANILCA requires that "[e]xcept as otherwise expressly provided for in this Act wilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act [.]" *Id.* § 707.

Title XI provides "a single comprehensive statutory authority for the approval or disapproval" of transportation and utility systems through public lands in Alaska. 16 U.S.C. § 3161(c). Congress enacted Title XI not only to ensure effective decision making but "to minimize the adverse impacts of siting transportation and utility systems within [conservation system] units established or expanded by this Act[.]" *Id.* Title XI reflects Congress's understanding that "existing law makes siting of roads and airports, particularly, but other modes as well, very difficult if not impossible in Wilderness, Parks, Wild and Scenic Rivers, and Wildlife Refuges (in descending order of difficulty)." Ex. 4, S. Rep. No. 96-413, 245 (1979). Congress created Title XI's procedures to "supersede[] rather than supplement[] existing law" for siting transportation on CSUs. *Id.* at 246. Any proposed road through an Alaska refuge must be approved or disapproved per Title XI's procedures, 16 U.S.C. §§ 3164, 3166, and Interior's implementing regulations, *see* 43 C.F.R. Part 36; any portion of a proposed road through an Alaska wilderness area also requires congressional approval. 16 U.S.C. § 3166(c)(1), (6).

Title XIII sets out administrative directives for CSUs. Subsection

1302(a), under "Land acquisition authority," provides:

> Except as provided in subsections (b) and (c) of this section, the Secretary is authorized, *consistent with other applicable law* in order to carry out the purposes of this Act, to acquire by purchase, donation, exchange, or otherwise any lands within the boundaries of any conservation system unit other than National Forest Wilderness.

16 U.S.C. § 3192(a) (emphasis added). Subsection 1302(h) specifies:

> Notwithstanding any other provision of law, in acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands (including lands within conservation system units . . .) [.]

> Exchanges shall be on the basis of equal value, and either party to the exchange may pay or accept cash in order to equalize the value of the property exchanged, except that if the parties agree to an exchange and the Secretary determines it is in the public interest, such exchanges may be made for other than equal value.

*Id.* § 3192(h)(1).

Congress did not intend that agencies should use this land exchange authority "to undermine the essential integrity of any conservation system unit or to frustrate the purposes of any such unit." Ex. 5, H.R. Rep. No. 95-1045, pt. I, 211–12 (1978) (§ 1201(f) at that point in the statute's development). Instead, it enacted this authority as a preferred alternative for acquiring private inholdings from willing sellers rather than through condemnation. *See* Ex. 1 at 304; *see also* Ex. 6, H. R. Rep. No. 96-97, pt. I, 245 (1979); Ex. 7, S. Rep. No. 95-1300, 257 (1978).

4. *National Wildlife Refuge System Improvement Act of 1997*

In 1997, Congress amended the Administration Act via the

Improvement Act to

> establish clearly the conservation mission of the System, provide
> clear Congressional guidance to the Secretary for management of
> the System, provide a mechanism for unit-specific refuge planning,
> and give refuge managers clear direction and procedures for
> making determinations regarding wildlife conservation and public
> uses of the System and individual refuges.

Ex. 8, H. Rep. No. 105-106, *3 (1997).

The System's mission is "to administer a national network of lands and

waters for the conservation, management, and where appropriate, restoration

of the fish, wildlife, and plant resources and their habitats within the United

States for the benefit of present and future generations of Americans." *Id.* §

668dd(a)(2).

Congress established as national policy that each refuge "shall be

managed to fulfill the mission of the System, as well as the specific purposes

for which that refuge was established." *Id.* § 668dd(a)(3)(A); *see also id.* §

668dd(a)(4)(D) (the Secretary must "ensure that the mission of the System . .

. and the purposes of each refuge are carried out[.]"). "This policy serves to

underscore that the fundamental mission of our Refuge System is wildlife

conservation: wildlife and wildlife conservation must come first." Ex. 8 at *9.

"Purpose(s) of the refuge" are "the purposes specified in or derived from

the law, proclamation, executive order, agreement, public land order,

donation document, or administrative memorandum establishing, authorizing, or expanding" a refuge. 50 C.F.R. § 25.12(a). For refuges with congressionally designated wilderness, "the purposes of the Wilderness Act are additional purposes of the wilderness portion of the refuge." *Id.*; *see also id.* § 35.2(a) (refuge wilderness areas shall be administered for the refuge's purposes and shall be administered to preserve wilderness character).

The Improvement Act established other management mandates, including as relevant here:

> (A) provide for the conservation of fish, wildlife, and plants, and their habitats within the System;
>
> (B) ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans;
>
> (D) ensure that the mission of the System described in paragraph (2) and the purposes of each refuge are carried out . . .; [and]
>
> (F) assist in the maintenance of adequate water quantity and water quality to fulfill the mission of the System and the purposes of each refuge[.]

16 U.S.C. § 668dd(a)(4). Congress intended these as "affirmative stewardship responsibilities[.]" Ex. 8 at *10.

Congress specified those instances where ANILCA's management directives override the Refuge Act's. *See* Pub. L. 105-57, § 9, 111 Stat. 1252, 1260 (1997); *see also*, *e.g.*, 16 U.S.C. § 688dd(e)(1)(A) (recognizing that ANILCA establishes comprehensive conservation planning requirements for

refuges in Alaska). Section 9 of the Improvement Act—codified as a note to 16 U.S.C. § 668dd—directly addresses potential conflicts with ANILCA regarding subsistence uses. *See* Pub. L. 105-57, § 9, 111 Stat. 1252, 1260 (1997). It establishes that the Improvement Act does not affect (1) ANILCA's provisions on subsistence uses; (2) ANILCA's definitions, and (3) ANILCA's provisions on the need to consider subsistence uses when determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands. *Id.* § 9(a). It also states that "[i]f any conflict arises between any provision of this Act and any provision of [ANILCA], then the provision in [ANILCA] shall prevail." *Id.* § 9(b). The legislative history for this section focuses solely on potential conflicts between the Refuge Act and the subsistence rights in Alaska that ANILCA protects. Ex. 8 at *14–15.

In enacting a uniform national policy and management directives for the System, Congress did not create a carve-out for refuges in Alaska. Nor did it amend the Administration Act's land exchange provision to distinguish between refuges inside and outside of Alaska.

D. Federal Defendants' Unlawful Land Exchange With KCC

The decades-long history of attempting to put a road through Izembek Refuge and Wilderness to connect the villages of Cold Bay and King Cove is summarized in *Friends of Alaska National Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1130–33 (D. Alaska 2019) and previous cases cited therein.

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

*See also* Compl., ECF No. 1 ¶¶ 71–100. On March 14, 2023, Federal Defendants withdrew the 2019 land exchange agreement, LE_043300–03, mooting ongoing litigation. *See Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, Civ. No. 20-35721, 2023 WL 4066653 (9th Cir. June 15, 2023).

Federal Defendants published a Draft Supplemental Impact Statement in November 2024. DSEIS, LE_003111. Plaintiff coauthored a comprehensive comment letter opposing the proposed exchange. DSEIS Comments by Defenders of Wildlife *et al.* (Coalition Comments), CO_122312.

In October 2025, Federal Defendants unlawfully exchanged lands to transfer a road corridor through the heart of Izembek to KCC for private road development. On October 21, 2025, Interior Secretary Burgum and Ms. Chantae Kochuten, Chief Executive Officer of KCC, signed an "Agreement for the Exchange of Lands" (Agreement), LE_000180, and Secretary Burgum signed the "Decision of the Secretary" (Decision), LE_000001, supporting the Agreement.

The same day, on behalf of the United States, an official of the Bureau of Land Management issued Patent 50-2026-0001 to KCC for the federal lands described in the Agreement. LE_000397. The next day, KCC issued a warranty deed to Federal Defendants for the KCC lands described in the Agreement. LE_000393. Federal Defendants accepted the warranty deed on behalf of the United States the same day. *Id.*

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG



*Figure 1: Land Exchange*
*(Decision at LE_000017)*

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

17

The Agreement memorializes Federal Defendants' commitment to transfer approximately 484 acres of surface and subsurface estate interests in both wilderness and non-wilderness refuge lands in Izembek to KCC in exchange for approximately 1,739 acres of land owned by KCC within the boundaries of Izembek Refuge. Decision at LE_000016. The disposed-of federal land creates a 15.6-mile corridor for an 18.9-mile road. *Id.* at LE_000018–19. Ten and a half miles of new construction will occur within Izembek Wilderness, *see id.* at LE_000018; *see also* Fig. 2. Federal Defendants transferred 336 acres of wilderness to KCC to make space for both the road and 12 of 15 material sites. *Id.*; DSEIS at LE_004347.

The road corridor is designed to accommodate a 13-foot-wide, single-lane gravel road and approximately 113 turnouts. The planned road includes one bridge, seven culverts or small bridges, and 62 cross-drainage culverts. The exchanged land includes space for 12 material sites within Izembek to mine gravel to build the road. Decision at LE_000021. The planned road has a total footprint of 186 acres of directly altered landscape comprising the road, turnouts, culverts and material sites.

Secretary Burgum executed the Agreement pursuant to ANILCA § 1302(h)(1), 16 U.S.C. § 3192(h)(1). *Id.* at LE_000029. The Decision claims that the consideration under ANILCA's land exchange provision integrates a balancing of ANILCA purposes, including § 101(d)'s putative "economic and



*Figure 2: Road Corridor with Existing Roads/Trails*
*(Decision at LE_000020)*

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

19

social needs" purpose. *Id.* at LE_00029–30. The Agreement and Decision rely solely on ANILCA's land exchange provision.

The Decision disavows any obligation to comply with the Refuge Act: "In reaching my decision, I have not made the determination identified in the 2024 Draft SEIS as being required by the provisions of the [Refuge Act]." *Id.* at LE_000054; *see also id.* at LE_000055. ("I disagree with the provision in the 2024 Draft SEIS that states that the land exchange must further the missions of the Izembek Refuge and the Refuge System."). It rationalizes this decision by asserting that the purposes of ANILCA are "broader than the mission of the Izembek Refuge and the mission of the Refuge System" and that, because they are in direct conflict, ANILCA prevails as per § 9 of the Improvement Act. *Id.* at LE_000055.

The Decision acknowledges the obligation to manage Izembek's wilderness consistent with the Wilderness Act, including the prohibition on permanent roads within wilderness. *Id.* Yet it claims that "this Decision to enter into the Proposed Land Exchange will result in the conveyance of the U.S. Exchange Lands to KCC and out of the Izembek Wilderness." *Id.* It also relies on the "notwithstanding any other provision of law" clause of § 1302(h). *Id.* at n.121. But it fails to acknowledge that a permanent road connecting King Cove and Cold Bay will lie within Izembek Wilderness, with wilderness lands to either side for roughly two-thirds of its length. It expressly declines

to limit the road to non-commercial purposes. *Id.* at LE_000044.

The Decision acknowledges that "[i]f the proposed road is constructed and operated, there will be some additional impacts on the wilderness characteristics of the adjoining areas that remain wilderness." *Id.* at LE_000056. It inaccurately characterizes those impacts as "limited because any road will be constrained to a single-lane gravel road and associated material sites are largely associated only with the construction of the road." *Id.* It expressly declines to require a barrier along the road to restrict access to adjoining refuge and wilderness lands. *Id.* at LE_000044.

Federal Defendants failed to complete the environmental analysis process under the National Environmental Policy Act initiated by the DSEIS. *Id.* at LE_000028. Alternative 6 evaluates the impacts of disposing of the Izembek road corridor ultimately traded away. *See id.* at LE_000018The Decision relies on the DSEIS's impact analysis of Alternative 6. *Id.* at LE_000044–45.

Federal Defendants' disposal of congressionally withdrawn refuge and wilderness lands to KCC for road development significantly degrades Izembek's value as wildlife habitat and wilderness. Federal Defendants' actions threaten the wildlife and wilderness values Congress intended to protect throughout Izembek Refuge and Wilderness, well beyond the boundaries of the road corridor.

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

21

## STANDING

Plaintiff has standing to bring claims on behalf of its members because "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action[]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiff has standing for its procedural violation claims because "there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed [it]." *Mass. v. EPA*, 549 U.S. 497, 518 (2007) (emphasis added).

Plaintiff has associational standing because "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 180–81.

Plaintiff's members have standing to sue. Plaintiff's members Brianne Rogers and Nicole Whittington-Evans have aesthetic and recreational interests in Izembek. *E.g.*, Ex. 9, Rogers Decl. ¶¶ 12, 16–20; Ex. 10, Whittington-Evans Decl. ¶¶ 30–34, 37–41. Ms. Rogers serves as a hunting guide in Izembek and also has economic interests at stake. Ex. 9 ¶¶ 13, 32,

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

22

34, 36. Both have concrete plans to return to Izembek. Ex. 9 ¶¶ 14; Ex. 10 ¶¶ 35. These interests have been harmed and will continue to be harmed by Federal Defendants' unlawful land exchange, absent judicial intervention. Ex. 9 ¶¶ 21–43; Ex. 10 ¶¶ 42–54.

These interests are germane to Plaintiff's mission of protecting native species and habitats. Plaintiff has spent decades advocating to protect Izembek's irreplaceable wildlife habitat and wilderness from this road. Ex. 10 ¶¶ 13–26. Plaintiff's members need not participate in this adjudication.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitation[]; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). An agency decision is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Courts may not "rubber-stamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

23

policy underlying a statute." *Ariz. Cattle Growers' Ass'n v. USFWS*, 273 F.3d 1229, 1236 (9th Cir. 2001) (cleaned up).

In interpreting statutes, courts must determine the "best reading" using "traditional tools" of statutory construction. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373, 400, 412 (2024). "[A] court may rely on contextual clues to discern Congress's intent," including a statute's structure, legislative history, and statements of purpose. *League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1018–19 (D. Alaska 2019), *vacated as moot by League of Conservation Voters v. Biden*, 843 Fed. Appx. 937 (9th Cir. 2021). The reviewing court should construe a statute to give effect to all its provisions, "so that no part will be inoperative or superfluous, void or insignificant." *Id.* at 1025 (cleaned up). Its interpretation of multiple statutes touching on the same subject must be driven by "the guiding principle [of] reconciliation"—where possible, the court must give meaning to both statutes. *Silver v. N.Y. Stock Exchange*, 373 U.S. 341, 357 (1963); *see also U.S. v. Borden Co.*, 308 U.S. 188, 198 (1939) ("When there are two acts on the same subject, the rule is to give effect to both if possible.").

## ARGUMENT

The Property Clause of the U.S. Constitution grants Congress the exclusive "Power to *dispose of* and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]"

U.S. Const., art. VI, § 3, cl. 2 (emphasis added). "Since the Constitution places the authority to dispose of public lands exclusively in Congress, the executive's power to convey any interest in these lands must be traced to Congressional delegation of its authority." *Sioux Tribe of Indians v. U.S.*, 316 U.S. 317, 326 (1942). Congress's complete power over public lands authorizes it to "constitutionally limit the disposition of the public domain to a manner consistent with its views of public policy." *U.S. v. City & Cty. of San Francisco*, 310 U.S. 16, 30 (1940).

Axiomatically, federal agencies "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022). Where Congress has delegated land disposal authority to a federal land management agency, the courts must "require the Executive to abide" by such statutory processes and limitations as Congress has seen fit to impose. *Wilderness Soc. v. Morton*, 479 F.2d 842, 892 (D.C. Cir. 1973).

In violation of the limits on their delegated statutory authority to dispose of refuge and wilderness lands in Alaska and the substantive and procedural requirements Congress imposed before such lands may be alienated from federal ownership and control, Federal Defendants treated ANILCA's land exchange provision as a blank check to transfer Izembek refuge and wilderness lands to KCC for a road. Because their actions violate the Refuge Act and the Wilderness Act, they must be vacated and remanded

and the land exchange ordered unwound.

## I. Federal Defendants Failed to Determine that the Lands Exchanged Out of Izembek Refuge Are Suitable for Disposition as the Refuge Act Requires

Congress limited Federal Defendants' authority to exchange away Refuge lands to those lands the Secretary finds "suitable for disposition." 16 U.S.C. § 668dd(b)(3). "When a statute requires an agency to make a finding as a prerequisite to action, it must do so." *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002). Federal Defendants made no such finding here.

In enacting ANILCA's land exchange provision, Congress limited the Secretary's authority to "acquire by purchase, donation, exchange, or otherwise any lands within the boundaries of any conservation system unit" to instances where such acquisition is "*consistent with other applicable law.*" 16 U.S.C. § 3192(a) (emphasis added). For the Izembek exchange, "other applicable law" is the Refuge Act. ANILCA § 304(a). Federal Defendants must follow both ANILCA's and the Refuge Act's requirements before conveying any Refuge lands to KCC.[4]

On November 15, 2024, Federal Defendants acknowledged that they must meet the Refuge Act's "suitable for disposition" requirement to execute a land exchange for a road through Izembek. DSEIS at LE_003130. On

---

[4] In challenging Federal Defendants' Refuge Act violations, Plaintiff does not concede the exchange fulfills ANILCA's purposes or other requirements.

December 20, 2024, the Service amended its Manual on realty operations to clarify that all land exchanges (including those in Alaska refuges) must satisfy the "suitable for disposition" standard and be "of benefit to the United States." 342 FW 5.7(B)(1).

Yet the Agreement disavows any obligation to comply with the Refuge Act. Decision at LE_000054–55. It fails to analyze whether the Izembek lands to be divested are suitable for disposition as the Refuge Act requires—indeed, it fails to acknowledge the Refuge Act's suitable for disposition requirement at all.[5] Federal Defendants' conclusion that the Refuge Act does not apply to this ANILCA land exchange rests on erroneous statutory interpretations that warrant no judicial deference. *Loper Bright*, 603 U.S. at 413.

Citing § 9 of the Improvement Act, the Decision asserts it may ignore the Refuge Act's requirements because these allegedly conflict with ANILCA's "broader" purposes. Decision at LE_000054–55. This misreads ANILCA and the Refuge Act (and other public land laws), and how Congress intended to harmonize them.

The Decision reads ANILCA § 101(d) as creating an affirmative "economic and social" purpose in addition to the statute's explicit conservation and subsistence purposes. Decision at LE_000034–38. But this

---

[5] There is no such thing as a "suitable for disposition pursuant to ANILCA" finding, Decision at LE_000055. 16 U.S.C. § 3192(a), (h).

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

27

provision states that ANILCA's statutory framework *already* "provides sufficient [conservation] protection . . . and at the same time provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people[.]" 16 U.S.C. § 3101(d). It concludes by stating "that the need for future legislation designating new conservation system units . . . has been obviated thereby," *id.*, making clear it is directed at future Congresses, not federal agencies. Section 101(d) does not justify completing the Izembek land exchange to further putative economic and social purposes, let alone invoking them to run roughshod over Izembek's specific Refuge purposes, ANILCA § 303(3)(B), and the mandate to comply with the Refuge Act in managing it, ANILCA § 304(a).

Congress expressly intended ANILCA's land exchange authority to complement the purposes of and management directives for each type of CSU, not undermine them. *See supra* Background C.3. That authority explicitly requires both that any acquisition (including by exchange) further ANILCA's purposes *and* that it be consistent with other applicable law. 16 U.S.C. § 3192(a). This does not set up an irreconcilable conflict between ANILCA's purposes and the Refuge Act's requirements. Rather, Federal Defendants must ensure that any land exchange for an Alaska refuge fulfill the Refuge Act's requirements, including the "suitable for disposition" condition precedent, as well as ANILCA's purposes.

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

28

Congress's treatment of the Administration Act's land exchange provision and ANILCA in the Improvement Act confirms this. Where specific provisions of the Administration Act were inconsistent with ANILCA, Congress amended those provisions via the Improvement Act to state that ANILCA governs. *See supra* Background C.4. But Congress did not amend the land exchange provision to exempt Alaska refuges from the "suitable for disposition" standard. *See* Pub. L. 105-57, § 5(b), 111 Stat. 1252, 1256 (1997) (making minor style amendments to the land exchange provision). Congress certainly could have done so if that were its intent for Alaska refuges.

In addition to the lack of direct statutory evidence that Congress intended to excuse Federal Defendants from Refuge Act compliance for all contemplated Alaska refuge land exchanges, the legislative history for § 9 of the Improvement Act, the section that Federal Defendants rely on, *see* Decision at LE_000055, shows only that Congress intended to protect subsistence rights in Alaska, not override all Refuge Act mandates. *See supra* Background C.4.

The Decision's interpretation of § 1302(a)'s "purposes of this Act" clause and § 101(d) to supersede the Refuge Act reads the "consistent with other applicable law" clause of § 1302(a), § 303(3)(B) (Izembek's Refuge purposes), and § 304(a) (the mandate to manage Alaska refuges pursuant to both the Refuge Act and ANILCA) out of ANILCA, violating bedrock principles of

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

29

statutory construction.[6] The best reading of these ANILCA provisions, together with the Refuge Act, is that Federal Defendants must ensure any exchange of refuge lands in Alaska both serves ANILCA's purposes and meets the Refuge Act's suitable for disposition requirement. Federal Defendants violated the Refuge Act by failing to make this finding.

## II. Federal Defendants Failed to Ensure Consistency with the Refuge Act's Mandatory Management Directives

The Refuge Act requires that management decisions for any refuge carry out both the mission of the System and the refuge's specific purposes, 16 U.S.C. § 668dd(a)(3)(A). It also establishes other mandatory management directives, *id.* § 668dd(a)(4). ANILCA requires Federal Defendants to manage Izembek pursuant to the Refuge Act as well as ANILCA, including when exercising their ANILCA land acquisition authority. *See* ANILCA § 304(a); 16 U.S.C. § 3192(a). Federal Defendants failed to ensure that their decision to sign the Izembek land exchange fulfilled the Refuge Act's substantive management directives.

In executing the Agreement, Federal Defendants disavowed any

---

[6] Federal Defendants' misreading of § 1302(a) to supersede all "other applicable law" has broader implications for managing CSUs governed by other laws. *See, e.g.*, ANILCA § 203 (National Park System); ANILCA § 503(c) (National Forest Monuments); ANILCA § 707 (National Wilderness System). Under Federal Defendants' interpretation, an exchange of lands out of any such unit would also be exempt from complying with the "other applicable laws" governing that unit's management.

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

30

obligation to consider, let alone meet, these statutory obligations, claiming that ANILCA's alleged "social and economic purpose" conflicts with, and thereby overrides, the Refuge Act's requirements to ensure consistency with Izembek's purposes and the mission of the System. Decision at LE_000054–55. But as demonstrated above, nothing in ANILCA supersedes Federal Defendants' obligations to comply with the Refuge Act in considering land exchanges in Alaska refuges. Together with ANILCA's purposes, the Refuge Act's management directives are statutory requirements that Federal Defendants must meet to ensure that any land exchange is "consistent with other applicable law" pursuant to 16 U.S.C. § 3192(a) and in accordance with ANILCA § 304(a).

After ANILCA's 1980 enactment, Congress had the opportunity to decide that Refuge Act management requirements should not apply to refuges in Alaska. In the Improvement Act, Congress amended the Refuge Act and made multiple revisions specifically noting where the Refuge Act's requirements are different for Alaska refuges. *See supra* Background C.4. Tellingly, with respect to the newly enacted mission and refuge purposes and other management directives, it did not do so.

Federal Defendants cannot manufacture a statutory conflict that reads part of § 1302(a) and § 304(a) out of existence based on their conclusion that the particular facts of the Izembek exchange justify its completion under an

economic and social needs rationale, *see* Decision at LE_000044, 54–55. Either ANILCA § 1302(a) and the Refuge Act must always harmonize, or they must always conflict—as a matter of statutory interpretation, not factual circumstance. The outcome cannot logically vary based on Federal Defendants' ANILCA purpose determinations for a particular exchange. Federal Defendants' failure to determine whether the Izembek exchange fulfills Izembek's statutory purposes, the mission of the Refuge System, and other management directives violates the Refuge Act and renders the land exchange void.

A. Impacts on Species and Habitat Conservation

The Refuge System's overarching goal is to conserve species and habitats. Federal Defendants' Refuge Act obligations to ensure that the Izembek exchange accomplishes this goal is reflected in Izembek's first Refuge purpose, ANILCA § 303(3)(B)(i); the mission of the System, 16 U.S.C. § 668dd(a)(3)(A); the Refuge Act's first management directive, *id.* § 668dd(a)(4)(A) (provide for species and habitat conservation in the System); second management directive (maintain biological integrity, diversity, and environmental health), *id.* § 668dd(a)(4)(B); and fourth management directive (carry out mission of the system and individual refuge purposes), *id.* § 668dd(a)(4)(D). *See supra* Background C.4. Wildlife and habitat conservation is also central to Izembek's second purpose of fulfilling international treaty

obligations, ANILCA § 303(3)(B)(ii), including the obligations of bilateral treaties implemented by the Migratory Bird Treaty Act. DSEIS at LE_003806.

Without complying with these Refuge Act mandates, Federal Defendants disposed of a corridor of land on the isthmus between Izembek's lagoons that is migratory bird habitat of international importance, *see id.* at LE_004268; aquatic habitat that supports salmon and other sensitive and native fish species, *see id. at* LE_004271; terrestrial habitat that is an important migratory corridor for caribou, *see id. at* LE_003918, and important natal habitat that supports the highest density of brown bears in the lower Alaska Peninsula, *see id. at* LE_003923. *See also* Ex. 1, at 136 (designating Izembek as wilderness in recognition that it "possesses outstanding scenery, key populations of . . . wildlife, and critical watersheds to Izembek Lagoon.").

Construction, maintenance, and use of a road and associated gravel mining and material sites through this pristine area will permanently degrade Izembek's wildlife habitats. This is expected to directly eliminate existing habitat within the road corridor, DSEIS at LE_004261–62 (plants), LE_004272 (fish), LE_004282 (birds), LE_004292 (mammals); destroy and permanently alter wetlands, *id. at* LE_004266–67; degrade soil conditions along the road and introduce stormwater pollutants to the watershed, *id. at*

LE_004252, LE_004268, LE_004272; result in wildlife avoiding habitats because of disruptive noise, *id.* at LE_004281–82 (birds), LE_004292 (mammals); physically bifurcate and fragment connected habitat, *id. at* LE_004272 (fish), LE_004282–83 (birds), LE_004292 (mammals); result in vehicle collisions, *id. at* LE_004282 (birds), LE_004293 (mammals); and increase access for on-road and off-road motor vehicle use that will further degrade habitat, *id. at* LE_004268 (wetlands), LE_004283 (birds), LE_004293 (mammals). *See also* Coalition Comments at CO_122330–32. By failing to consider—and thus authorizing—these impacts, Federal Defendants violated the Refuge Act's mandatory management directives.

For the same reasons, Federal Defendants violated the Refuge Act's directive to preserve the biological integrity, diversity, and environmental health of the system. DSEIS at LE_004268 (acknowledging that "construction of a road through a land exchange will cause . . . loss of biological integrity"); *see also* Coalition Comments at CO_122349–53. The road corridor bisects major portions of Izembek and will result in significant fragmentation. Of particular concern, the road corridor is sited in the migratory corridor connecting the calving grounds and feeding grounds for the local caribou herd. DSEIS at LE_003918.

In a Manual provision discussing biological integrity, diversity, and environmental health, the Service explains that "[f]ragmentation of the

National Wildlife Refuge System's wildlife habitats is a direct threat to the integrity of the National Wildlife Refuge System, both today and in the decades ahead," and instructs that actions that "reduce the quality or quantity or fragment habitats on a national wildlife refuge" are inconsistent with this management directive. 603 FW 2.5(A). Yet Federal Defendants fail to explain in the Agreement how the road corridor will avoid these serious harms to Refuge habitat. Finally, the environmental health component requires avoiding "unnatural physical structures, including . . . infrastructure [that] may displace space or may be obstacles to wildlife migration." 601 FW 3.10.C(3). Exchanging lands for the express purpose of allowing a road to be constructed within a refuge runs directly counter to this directive. Environmental health also requires "preventing chemical contamination of air, water, and soils," and "[u]nnatural noise and light pollution," *id*. at 3.10(C)(2), 3.10(C)(3), all of which will be undermined by introducing vehicle traffic to Izembek.

   B. Impacts on Migratory Waterfowl Conservation and Water Quality
        and Quantity

Izembek's fourth Refuge purpose is to ensure its water quality and necessary water quantity. ANILCA § 303(3)(B)(iv). Similarly, the Refuge Act's sixth management directive, 16 U.S.C. § 668dd(a)(4)(F), is to assist in maintaining adequate water quality and quantity to fulfill the System's

mission and each refuge's purpose. Additionally, Izembek's lagoons are "wetlands of international importance" designated pursuant to the Ramsar Convention, an international treaty for the wetlands conservation. DSEIS at LE_003879. Federal Defendants must manage Izembek not only to maintain its water quality but to fulfill their Ramsar Convention obligations, as required by Izembek's second Refuge purpose. ANILCA § 303(3)(B)(ii).

Federal Defendants disposed of lands within wetlands hydrologically connected to the Izembek lagoons, removing those lands from federally protected status that preserved the untouched character and quality of the hydrological system. Worse, Federal Defendants did so for the express purpose of allowing a road to be constructed over and for vehicles to regularly traverse those wetlands, irretrievably degrading these hydrological systems. Federal Defendants' actions directly undermine both Izembek purposes. *See* DSEIS at LE_004272 (water quality); LE_003968–69 (Ramsar Convention); *see also* Coalition Comments at CO_122332–34. Federal Defendants violated the Refuge Act by failing to determine the exchange's consistency with Izembek's second and fourth Refuge purposes and the Refuge Act's sixth management directive.

C. Impacts on Subsistence Uses

Congress established Izembek's third Refuge purpose as to provide, consistent with its first two purposes, the opportunity for continued

subsistence uses by local residents. ANILCA § 303(3)(B)(iii). Federal Defendants previously found that a road through Izembek "would have direct and indirect effects on subsistence," of "low to medium intensity [and] long-term duration." DSEIS at LE_004341. The road corridor is expected to cause displacement and avoidance by wildlife species critical to subsistence users and increased access and competition along the road. *Id.*; *see also* Coalition Comments at CO_122333–34, CO_122404–08; Earthjustice Comment at CO_130258–60. In the ANILCA Final Section 810 subsistence analysis for the Decision, Federal Defendants again found that the road "may significantly restrict subsistence uses." Decision at LE_000145. Yet Federal Defendants concluded that this level of restriction "is necessary," *see id.*, and that they could ignore those impacts based on a balancing of larger interests, *see id.* at LE_000038–40. Federal Defendants' failure to consider the consistency of the exchange with Izembek's third Refuge purpose violated the Refuge Act.

   D.  Destruction and Degradation of Wilderness Character In and
        Adjacent to Road Corridor

   Izembek has a fifth purpose, to serve the purposes of the Wilderness Act. 16 U.S.C. § 1133(a); 50 C.F.R. § 25.12(a). As discussed below, constructing and operating a road—as well as increased illegal ATV access to adjacent refuge wilderness areas—will irreparably destroy or degrade

Izembek's wilderness, both in the corridor and in surrounding wilderness areas where the road will be visible and traffic audible. *See* DSEIS at LE_004347–50; *see also* Coalition Comments at CO_122335–36, 55–57. Federal Defendants' failure to consider the consistency of the exchange with Izembek's fifth Refuge purpose violated the Refuge Act.

## III. Federal Defendants Violated the Wilderness Act by Enabling a Permanent Road and Commercial Enterprise Within Izembek Wilderness

Under the Wilderness Act, Federal Defendants cannot lawfully allow a permanent road or commercial enterprise within wilderness. 16 U.S.C. § 1133(c). Even though the road corridor has been transferred to private ownership, over ten miles of the corridor are an inholding lying within wilderness to either side. *See* Fig. 2.

Federal Defendants previously concluded that a road through Izembek Wilderness would violate the Wilderness Act. *See, e.g.*, 2003 FEIS at LE_010999 ("Construction and operation of Alternative 6 [Isthmus Road] would be in violation of the provisions of the Wilderness Act"). In approving the Agreement, Federal Defendants offer no convincing rationale to the contrary.

The Decision coyly asserts that it does not violate the Wilderness Act's roadless mandate, as it merely carves a road-shaped hole through wilderness, divesting that land of wilderness status. Decision at LE_000055. Indeed, it

acknowledges that the road will be "within" wilderness because "adjoining areas" will "remain wilderness." *Id.* at LE_00056. But the Wilderness Act's prohibition on permanent roads within wilderness is absolute, even if the Federal Defendants have unlawfully transferred the road corridor itself out of the public domain. The Wilderness Act's prohibitions—and Congress's exclusive authority to waive these prohibitions for a road through Alaska wilderness via Title XI—cannot be sidestepped through such sophistry. *See City & Cty. of San Francisco*, 310 U.S. at 28 ("Mere words and ingenuity of contractual expression, whatever their effect between the parties, cannot by description make permissible a course of conduct forbidden by law.").

The Decision also cites § 1302(h)'s "[n]otwithstanding any other provision of law" clause in support. Decision at LE_000055 n.121 That clause is a far cry from the unequivocal language necessary to demonstrate Congress intended to supersede the Wilderness Act's prohibitions by allowing an exchange to circumvent them. The Ninth Circuit has "repeatedly held that the phrase 'notwithstanding any other law' is not always construed literally." *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996); *see also U.S. v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007). Courts must "determine[] the reach of each such 'notwithstanding' clause by taking into account the whole of the statutory context in which it appears." *Novak*, 476 F.3d at 1046.

Here, the best reading of the "notwithstanding" clause is that it

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

39

overrides only those statutory requirements for land exchanges in federal land management statutes that are in direct conflict. ANILCA's land exchange provision requires an equal value exchange unless the Secretary determines it is in the public interest not to require an equal value exchange. *See* 16 U.S.C. § 3192(h). The Refuge Act has no public interest exception to the equal value exchange requirement. *See* 16 U.S.C. § 668dd(b)(3). These provisions are in direct conflict, consistent with the Court's previous findings: examining ANILCA as a whole and applying the circuit's law on notwithstanding clauses, it held that "the notwithstanding provision was meant to exempt land exchanges from the requirement of equal value or complex public interest exchanges that were required by other statutes in place when ANILCA was enacted." *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 463 F. Supp. 3d 1011, 1025–26 (D. Alaska 2020).[7] The court concluded that the notwithstanding clause did not override anything beyond conflicting land exchange equalization of value provisions. If Congress had intended a different result, "it would have done so explicitly, given that it did so elsewhere in ANILCA." *Id.* at 1026.

---

[7] While the Ninth Circuit overturned this decision, it did so based on its interpretation of other provisions of ANILCA, not Section 1302(h)'s notwithstanding clause. It also failed to analyze the "consistent with other applicable laws" clause. *See Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F.4th 432, 443–44 (9th Cir. 2022), *vacated for en banc review*, 54 F.4th 608 (9th Cir. 2022).

In citing the "notwithstanding" clause of § 1302(h), moreover, the Decision ignores the "consistent with other applicable laws" requirement of § 1302(a). 16 U.S.C. § 3192(a). This includes the Wilderness Act. ANILCA § 707. The Decision's overly broad reading of the "notwithstanding" clause in § 1302(h) reads both § 1302(a) and ANILCA § 707 out of the statute.

The Decision also fails to acknowledge the Wilderness Act's express prohibition on commercial enterprise within wilderness. Indeed, it deliberately refuses to place any restrictions on non-commercial uses of the road corridor, to serve the purported "ANILCA purpose of providing an adequate opportunity for satisfaction of the economic and social needs of the people of Alaska." Decision at LE_000044.

Where Congress intended exceptions to Wilderness Act prohibitions to apply in Alaska, it enacted express provisions to that effect. The land acquisition authority and land exchange provision contain no such express exceptions.

In contrast, in Title XI, Congress established a detailed procedure for federal agencies to consider authorizing rights-of-way and other necessary permits through CSUs for transportation or utility infrastructure under their applicable laws, *see* 16 U.S.C. § 3162(1); 43 C.F.R. § 36.2(b), so long as wilderness lands are not involved, 16 U.S.C. §§ 3164(g)(1), 3166(a)(1), § 3166(c)(6); 43 C.F.R. §§ 36.7(a), 36.9(a). Where wilderness lands are involved,

Title XI requires a separate process culminating in congressional approval before the authorization may issue under applicable law. 16 U.S.C. §§ 3166(b)–(c); 43 C.F.R. §§ 36.7(b), 36.9(a).

Similarly, where Congress intended to override the Wilderness Act's commercial enterprise prohibition within Alaska wilderness, it did so explicitly. In "Wilderness management," 16 U.S.C. § 3203, Congress set forth management directives for activities Alaska wilderness that might otherwise fall under the commercial enterprise prohibition, including aquaculture, *id.* § 3203(b); existing cabins, *id.* § 3203(c); new cabins, § 3203(d); timber contracts, *id.* § 3203(e); and beach log salvage, *id.* § 3203(f). Other provisions that exempt activities that might qualify as commercial enterprises from Wilderness Act prohibitions include 16 U.S.C. § 3199 (existing and new navigation aids and other facilities) and 16 U.S.C. § 3150(a) (core and test drilling for geologic information for mineral assessment program).

Given ANILCA's Title XI's express statutory requirement for congressional approval for any road through Alaska wilderness and its express exemptions from the Wilderness Act's prohibitions only for specified uses and activities in Alaska wilderness, Federal Defendants cannot credibly argue that Congress implicitly authorized them to circumvent these provisions by simply transferring wilderness lands out of the National Wilderness System to a third party via land exchange. Had Congress

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

intended this result, it would have said so.

Only Congress may waive the Wilderness Act's statutory prohibitions against permanent roads and commercial enterprises within Izembek wilderness. It indisputably has not. By authorizing a permanent road and commercial enterprise within Izembek Wilderness via an unlawful land exchange, Federal Defendants violated the Wilderness Act.

## IV. Federal Defendants Violated the Wilderness Act's Mandate to Preserve Izembek's Wilderness Character by Arbitrarily Concluding that the Road Will Have Limited Impacts

Even if Federal Defendants could lawfully dispose of a road corridor through Izembek wilderness lands—which they cannot—they have also violated their obligation to manage Izembek's surrounding wilderness areas by preserving their wilderness character, consistent with the Wilderness Act. 16 U.S.C. § 1133(b). The Decision acknowledges that requirement and purports to analyze the exchange's impacts on surrounding wilderness areas. Despite irrefutable record evidence that a road through Izembek will destroy its wilderness character, the Decision arbitrarily concludes otherwise, claiming that impacts to adjoining wilderness will be "limited because any road will be constrained to a single-lane gravel road and associated material sites are largely only with the construction of the road." Decision at LE_000056.

Wilderness is defined by its "primeval character and influence" and the

*Defenders of Wildlife v. Burgum*, Case No. 3:25-cv-00319-SLG

43

absence of "permanent improvements or human habitation." 16 U.S.C. § 1131(c). In designating the Izembek Wilderness, Congress recognized Izembek's unique "outstanding scenery" and its role as "critically important habitat" for "wilderness-related wildlife" as deserving protection through "restricting access to the lagoon," which sits at the heart of the refuge. Ex. 1 at 136. Under the Service's wilderness non-degradation policy, the "conditions prevailing" in Izembek Wilderness at the time of its congressional designation—1980—establish the benchmark of Izembek's wilderness character and value. 610 FW 1.5(Q). A road cutting through Izembek Wilderness will inherently destroy its primeval character, enabling unlawful ATV access and permanently degrading prevailing wilderness conditions.

The Decision concedes the road's construction and operation will cause "some additional impacts on the wilderness characteristics of the adjoining areas that remain wilderness." Decision at LE_000056. This grossly understates the truth. Decades of analysis have concluded that the impacts of a road through Izembek would fundamentally destroy the wilderness character of the area. *See, e.g.*, 1985 Final Environmental Impact Statement at CO_122960 ("The presence of the road and the accompanying increased human presence would degrade wilderness values both along the road corridor and in the refuge interior—the noise from vehicles driving along the road and the visual presence of the road could adversely affect the wilderness

experience of refuge users[.]"); 1996 Report at CO_122770 ("Presence of a road and accompanying increased human disturbance would degrade wilderness values along the road corridor and adjacent refuge habitats."); 2013 Record of Decision at LE_002944 ("The impact of road construction on wilderness character would radiate far beyond the footprint of the road corridor" and ultimately "irreparably and significantly impair this spectacular Wilderness refuge.").

In 2024, Federal Defendants acknowledged significant visual and noise impacts from construction activities, including at gravel extraction sites within Izembek Wilderness. DSEIS at LE_004347. "[The] additional noise and construction activity would affect the untrammeled, undeveloped, and natural qualities of the area, reducing opportunities for solitude or primitive and unconfined recreation." *Id.* at LE_004347–48. Federal Defendants explicitly characterized those impacts as having a "high" intensity, "substantially affecting" the wilderness character of the area in a way that "would be highly noticeable to visitors." *Id.* at LE_004348.

Beyond construction impacts, Federal Defendants concluded that operation and maintenance of the road as having "ongoing direct and indirect effects on wilderness character." *Id.* Traffic on the road would lead to increase noise and disturbance and increased human presence "impacting [Izembek Wilderness's] natural qualities." *Id*. at LE_004349. Federal Defendants also

described the impact of increased opportunities for ATVs to access Izembek Wilderness and "illegal trail proliferation," directly destroying the landscape and disrupting the motorless status of the wilderness surrounding the road. *Id*. Notably, the Agreement does not include the mitigation measure of permanent guardrails along the road contemplated in the DSEIS to limit unlawful ATV access. *See id*. at LE_004350.

The Decision contests none of these impacts. *See* Decision at LE_000055–56. Instead, it underplays the impacts to wilderness surrounding the road as "limited," and points to the relative value of the lands within wilderness boundaries gained via the exchange. *Id*.

But Congress's unequivocal wilderness preservation mandate does not allow for offsets or allegedly limited impacts. Congress specifically designated Izembek Wilderness to protect the Izembek isthmus and lagoons. Federal Defendants cannot achieve Congress's goals for preserving that specific area by trading a corridor running through the isthmus and increasing access to the lagoons for other wilderness, regardless of its size or value. The record evidence demonstrating the severe degradation Izembek Wilderness will suffer as a consequence of the road belies Federal Defendants' disingenuous characterization of the expected impacts of constructing and operating the road as "limited."

The Decision's characterization of the status and value of the

wilderness lands disposed of is factually erroneous and contrary to record evidence. It rejects prior findings that this wilderness area is "pristine and untrammeled," citing prior motorized use along existing roads and trails predating ANILCA. *See id.* at LE_000031. Yet 10.5 miles of the road corridor sit within wilderness on land without existing trails and roads. *See* Fig. 2. The most recent aerial survey of legal and illegal trails showed that they were limited to areas on either end of the road corridor concentrated around existing and new roads. LE_027955–56 (aerial survey discussion), 67 (2022 survey map). Contrary to the Decision's assertions, significant portions of the road corridor and surrounding lands are in fact pristine and untrammeled.

Even where trails are present, they do not justify disposing of those wilderness lands. Roads that predate Izembek's wilderness designation are irrelevant to its wilderness value. *See* 610 FW 1.5(Q). In 1980, Congress found most of Izembek worth protecting as wilderness despite the existence of those historic roads. Federal Defendants cannot now find that wilderness is not deserving of protection. Nor can Federal Defendants point to trails developed in the last twenty years stemming from the road to the King Cove northeast hovercraft terminal landing pad to justify disposing of the road corridor. Federal Defendants were obligated to prevent the expansion of illegal trails both as a matter of law under the Wilderness Act, 16 U.S.C. § 1133(b), and their own non-degradation policies, 610 FW 1.5(Q). Federal

Defendants cannot fail to fulfill these obligations and then arbitrarily exploit their failure as an excuse to dispose of these lands in violation of the Wilderness Act.

## CONCLUSION

Plaintiff respectfully requests that the Court grant this Motion for Summary Judgment, vacate and remand the Decision and the Agreement, invalidate Federal Defendants' issuance of patent and acceptance of warranty deed, invalidate KCC's acceptance of patent and issuance of warranty deed, and grant all appropriate relief.

Respectfully submitted this 20th day of February 2026.

*/s/ Jane P. Davenport*
Jane P. Davenport (pro hac vice)
Daniel Franz (pro hac vice)
Defenders of Wildlife
1130 17th St. NW
Washington, DC 20036
(202) 682-9400 (tel)
jdavenport@defenders.org
dfranz@defenders.org

*Attorneys for Plaintiff Defenders of Wildlife*

## CERTIFICATION OF WORD COUNT

Pursuant to L. Civ. R. 7.4(a)(1), I certify that the word count for this filing is 9,994 words, excluding the case caption, tables, and the signature block.

Dated: February 20, 2026

*/s/ Jane P. Davenport*

Jane P. Davenport (pro hac vice)
Daniel Franz (pro hac vice)
Defenders of Wildlife
1130 17th St. NW
Washington, DC 20036
(202) 682-9400 (tel)
jdavenport@defenders.org
dfranz@defenders.org

*Attorneys for Plaintiff Defenders of Wildlife*